NOT YET SCHEDULED FOR ORAL ARGUMENT

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| REH CO., LLC, <br> *Petitioner,* <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> *Respondent.* | No. 25-1180 (and consolidated cases) |

**REPLY OF CLEAN FUELS ALLIANCE AMERICA
IN SUPPORT OF MOTION FOR LEAVE TO INTERVENE ON
BEHALF OF RESPONDENTS**

Clean Fuels Alliance America ("Clean Fuels") should be granted leave to intervene because its interests are directly implicated by the relief Petitioners seek. If their petitions are successful, Petitioners would receive more and greater exemptions from the Renewable Fuel Standard, which would then require less of Clean Fuels' products to be blended into the nation's fuel supply.

Petitioners do not dispute that obvious economic reality, nor can they. Instead, the thrust of their opposition is that Clean Fuels' declaration supporting its intervention motion does not prove a concrete injury-in-fact. That is not required for an intervenor who does not seek any relief distinct from that sought by an existing

party. Even so, Clean Fuels has done more than enough to demonstrate standing here. Clean Fuels' declaration explained how small-refinery exemptions directly impact demand for its members' products (biomass-based diesel or "BBD"), highlighted an academic study quantifying the impact of small-refinery exemptions on BBD demand, and described the specific ways that Petitioners' requested relief would increase the number and impact of exemptions. It is not clear what further magic words Petitioners believe were required.

## I. Article III Standing is Not Required for Intervenors Who Seek the Same Relief as an Existing Party.

A fundamental premise of Petitioners' motion is what Petitioners have termed "the injury rule"—their assertion that all intervenors must pass the same injury-in-fact hurdle as parties who are required to demonstrate Article III standing. *See* Opp 17–18. That premise is inconsistent with recent decisions of the Supreme Court and this Court.

The Supreme Court recently explained—very plainly—that it is "not … incumbent on [a party] to demonstrate its standing" when it is "an intervenor in support of the [defendants]." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019). Petitioners attempt to brush aside *Virginia House* as "only" one case that did not "analyze[] the standards for intervention." Opp. 17. One case is enough, though, when it is a binding Supreme Court precedent. And it squarely addressed the precise issue here—whether an intervenor in support of a defendant

2

(or respondent) must demonstrate standing. Specifically, the Supreme Court held that the Virginia House of Delegates *did* need to demonstrate standing to pursue an appeal on its own, and it distinguished that from the posture below, where the House of Delegates had *not* needed to demonstrate standing because it was an intervenor pursuing the same interests as other state defendants.

Petitioners' main counterpoint is their assertion that "more than four decades" of D.C. Circuit precedent cut the other way. Opp. at 7. And they claim that a recent (post-*Virginia House*) opinion of this Court reaffirmed that approach. *Id.* at 17.

But Petitioners neglect to mention this Court's statement in *Institutional Shareholder*—decided less than six months ago—that "while Intervenors seeking relief broader than or different from that sought by existing parties must possess constitutional standing … intervenors that seek the same relief sought by at least one existing party need not do so." *Institutional Shareholder Servs., Inc. v. Sec. & Exch. Comm'n*, 142 F.4th 757, 764 (D.C. Cir. 2025). At issue in that case was a party in the same situation as in *Virginia House*—an intervenor that *did* need to show standing when it pressed its own appeal but *did not* need to show standing as an intervenor in support of the respondent below. *Id.* This Court acknowledged that its holding was "in tension" with prior D.C. Circuit precedents requiring all intervenors to demonstrate standing. But it found that its interpretation was compelled by another recent Supreme Court case, *Little Sisters of the Poor Saints*,

3

which held that a circuit court "'erred by inquiring into [intervenors'] independent Article III standing,' when they sought the same relief as the federal government, which 'clearly had standing.'" *Id.* (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020)).

Petitioners instead point to a recent statement of this Court in *IGas Holdings, Inc. v. EPA*, 146 F.4th 1126, 1135 n.2 (D.C. Cir. 2025), which Petitioners characterize as "confirm[ing] its longstanding approach to intervention." But far from "confirming" anything, *IGas* explicitly acknowledged a split in this Court's authorities. *Id.* After its statement that "Article III standing is a prerequisite to intervention, even as a respondent," this Court added a "*but see*" citation to *Institutional Shareholder* and acknowledged the "tension with cases holding that intervenors that seek the same relief sought by at least one existing party need not show standing." *Id.*

Ultimately, this Court does not *need* to resolve whether intervenors supporting respondents must demonstrate standing—as discussed below, it is obvious and straightforward that Clean Fuels would suffer injury-in-fact if Petitioners are successful. But this case presents an opportunity to address a meaningful inconsistency among this Court's precedents and between this Court's precedents and controlling Supreme Court authority. The simplest way to do so would be to use this Court's process outlined in *Irons v. Diamond*, 670 F.2d 265 (D.C. Cir. 1981).

Contrary to Petitioners' claim that the *Irons* process cannot be used to "topple" a precedent that is "deeply rooted," Opp. at 17, it is appropriate for resolving precedents that are now inconsistent with the Supreme Court's instructions. Or, if this Court prefers, it could always convene an *en banc* hearing.

## II. To the Extent Intervenors Supporting a Respondent Must Demonstrate Article III Standing, Clean Fuels Clearly Has It.

"When the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025). In such cases, standing can be demonstrated based on "commonsense economic realities." *Id.*

Here, the "economic reality" that more and greater exemptions from the Renewable Fuel Standard will harm biofuel producers could not be more "commonsense." The RFS is a "market forcing policy" that "create[s] demand pressure to increase consumption of renewable fuel." *American Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 568 (D.C. Cir. 2019). It does so by requiring volumes of biofuel that must be blended into the nation's fuel supply, and EPA must translate those overall volumes into individual obligations applicable to individual refiners and importers. If fewer refiners and importers have obligations

5

(or lower obligations), the RFS requires less renewable fuel to be blended. That means there is less demand for the biofuel made by Clean Fuels' members.

That demand destruction is particularly acute when EPA provides current-year RFS credits to a refinery that is granted an exemption for a past year for which it has already complied with its obligation. That situation, which amounts to a windfall for refiners that directly reduces current volumes, is exactly what many of the Petitioners in this case seek. Tellingly, refiners have recently acknowledged in their financial disclosures the direct impact that such exemptions have on their current compliance with the RFS. *See, e.g.*, Todd Neely, *State AGs Accuse Small Refineries of Gaming Renewable Fuel Standard Exemptions While Reporting Strong Profits* (Oct. 30, 2025), *available at* ihttps://www.dtnpf.com/agriculture/web/ag/news/article/2025/10/30/state-ags-accuse-small-refineries (quoting a Par Pacific earnings call that observed that "We've covered our obligations going back to 2019 through 2024. So, any retroactive receipt of small-refinery exemptions would be direct cash proceeds in terms of getting [RFS credits] back and selling those at market prices.")

Petitioners do not dispute how the RFS or basic economics work. Instead, they contend that Clean Fuels' declaration submitted in connection with its intervention motion was too "sparse and conclusory" to sufficiently demonstrate that straightforward injury. Opp. at 8–9. Petitioners base that assertion almost entirely

6

on this Court's holding in *Sinclair Wyoming Ref. Co. LLC v. EPA*, 114 F.4th 693, 721 (D.C. Cir. 2024), but that case is inapposite here for two reasons.

First, the biofuels group in *Sinclair Wyoming* was *allowed to intervene*. *Id.* at 721. This Court determined only that the group had not demonstrated standing in connection with issues on which it was a petitioner. *Id.* ("We do not reach the merits *of this petition*, however, because Growth Energy has failed to meet its burden of establishing standing.") (emphasis added).

Second, Clean Fuels has submitted additional supporting information in this case. In a declaration, Clean Fuels Vice President Kurt Kovarik explained how the relief Petitioners seek (more small-refinery exemptions) directly causes less demand for Clean Fuels' members products (biomass-based diesel). Kovarik Decl. ¶¶ 15–21. As the declaration clarified, biomass-based diesel is typically more expensive than petroleum diesel, so the market will prefer petroleum diesel in the absence of the market-forcing incentives of the RFS. *Id.* ¶ 16. And because biomass-based diesel is a "nested" category of fuel within the RFS that qualifies to meet the biomass-based diesel volume, advanced biofuel volume, and total renewable fuel volume, biomass-based diesel demand is influenced by reductions in the required amount of each of those fuel categories. *Id.* The declaration also summarized academic research published by economist Scott Irwin that quantified the impact of past years' small refinery exemptions (which include many of the *same* exemptions

7

that EPA is re-granting now). *Id.* ¶ 17. According to Dr. Irwin's modeling, small-refinery exemptions granted for the 2018 calendar year alone lowered demand for BBD by over 900 million gallons. *Id.*

In that respect, Clean Fuels' motion and accompanying declaration are much more like the evidence in *National Biodiesel Board v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016), where this Court concluded that Clean Fuels (then known as the National Biodiesel Board) had standing. As in *National Biodiesel Board*, Clean Fuels has provided a detailed explanation of the connection between the relief sought and harm to its members and expert analysis quantifying that impact. Petitioners attempt to distinguish *National Biodiesel Board* by picking out particular details of the declaration there, such as "which regions of the country [EPA's decision] would affect," and "the capacity of the domestic industry." Opp. at 13. But those are simply details that were uniquely relevant to the issue in that case (imports of Argentinian biodiesel). Here, Clean Fuels has provided all of the details that are relevant to the impacts of small-refinery exemptions.[1]

Finally, Petitioners argue that this Court should "at a minimum" conclude that

---

[1] Petitioners also attempt to distinguish cases like *Military Toxics Project*, 146 F.3d at 951, by asserting that Clean Fuels is only "directly regulated" by the RFS itself, not by small-refinery exemptions. Opp. at 16. That is a distinction without a difference. Because each small refinery exemption is a reduction in the amount of renewable fuel required by the RFS, each exemption inherently impacts the quantity of biofuels that Clean Fuels' members will sell.

8

Clean Fuels lacks standing to intervene with respect to two specific refineries' petitions, "if it severs those cases from the other consolidated cases." Opp. at 14–15. Petitioners' logic is that those two refineries comprise a "tiny percentage of exempted RINs at issue" and therefore will not "have any impact on the overall renewable fuel market, let alone on the subset of that market supplied by the Alliance's members." *Id.* But that type of de minimis argument has been consistently rejected in the context of standing analysis because "a dollar of economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). The magnitude of an economic injury is a merits question that is "irrelevant" to whether there is standing. *Id. See also Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 983, 197 L.Ed.2d 398 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("The consumers' alleged economic harm—even if only a few pennies each—is a concrete, non-speculative injury.").[2]

So, even if this Court concludes that Clean Fuels must demonstrate Article III standing to intervene in this case, Clean Fuels has sufficiently made that showing.

---

[2] Petitioners' emphasis on *Sinclair Wyoming*'s reference to 31 small refineries, Opp. at 14, is misplaced. There, the court did not conclude that number of small-refinery exemptions was insufficient in magnitude to confer standing but merely that insufficient evidence had been provided. In light of the specific explanation and economic analysis provided in this case, the number of exemptions is immaterial.

9

Respectfully submitted,

/s/ *Douglas A. Hastings*
Douglas A. Hastings
Bryan M. Killian
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
(202) 739-3000 (telephone)
(202) 739-3001 (facsimile)

*Counsel for Clean Fuels Alliance America*

Dated:   November 7, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1), I certify that the foregoing meets the type-volume limitations of Rule 27(d)(2)(A) because it contains 2,058 words.

/s/ <em>Douglas A. Hastings</em>

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, I caused the foregoing to be electronically filed with the Clerk of the U.S. Court of Appeals for the D.C. Circuit by using the Court's appellate CM/ECF system and that service will be accomplished by the appellate CM/ECF system.

                                                        /s/ *Douglas A. Hastings*