<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

GROWTH ENERGY,

*Petitioner,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

_____

RENEWABLE FUELS ASSOCIATION,

*Petitioner,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

Nos. 25-1226; 25-1228 (consolidated with Nos. 25-1180, *et seq.*)

## <u>MOTION OF</u><br><u>COALITION TO PRESERVE REFINED FUEL MARKETS</u><br><u>TO INTERVENE IN SUPPORT OF PETITIONERS</u>

## INTRODUCTION

Respondent Environmental Protection Agency ("EPA") published a final action, *August 2025 Decisions on Petitions for RFS Small Refinery Exemptions*, EPA-420-R-25-010 (Aug. 2025) ("SRE Decisions"), responding to 175 petitions for small refinery exemptions ("SREs") from 38 refiners. These SREs exempt certain refiners, in whole or in part, from their regulatory obligations under the Renewable Fuel Standard program for compliance years 2016 through 2024. Growth Energy and the Renewable Fuels Association have filed separate petitions for review of the SRE Decisions. *See* Case No. 25-1226 (*Growth Energy v. EPA*) and Case No. 25-1228 (*Renewable Fuels Association v. EPA*).

The Coalition to Preserve Refined Fuel Markets ("Coalition") is a business league organization with members that own and operate petroleum refineries and petroleum fuel importers throughout the United States. As its name suggests, the Coalition was formed to protect its members' interests in fair and open refined fuel markets. *See* Ex. A, Declaration of Ethan Jones ("Jones Decl.") ¶¶ 3–5. Members of the Coalition own and operate more than fifteen U.S. refineries. *Id.* ¶ 3. Because the Coalition's members produce or import transportation fuels into the

United States, they must comply with the Renewable Fuel Standard program.

EPA's SREs adversely affect the Coalition's members by giving rival refiners an unfair competitive advantage. EPA's SREs also threaten the Coalition's members with increased compliance costs under the program because EPA forces non-exempt refiners and importers to shoulder the renewable fuel obligations of exempt refiners. This unfair competitive advantage and the increased compliance costs harm the Coalition's non-exempt members. Accordingly, pursuant to Federal Rules of Appellate Procedure 15(d) and 27 and D.C. Circuit Rules 15(b) and 27, the Coalition respectfully moves to intervene in support of Petitioners Growth Energy and Renewable Fuels Association.

Petitioner Renewable Fuels Association states that it does not oppose this motion. Respondent EPA takes no position on the motion and reserves its right to respond. Petitioner Growth Energy has not responded to the Coalition's request as of the time of filing.

2

## BACKGROUND

"The Clean Air Act's Renewable Fuel Program requires … renewable fuel to be introduced into the Nation's transportation fuel supply each year." *Americans for Clean Energy v. EPA*, 864 F.3d 691, 696 (D.C. Cir. 2017) (citing 42 U.S.C. § 7545(*o*)). For 2023 and later calendar years, EPA implements the Renewable Fuel Standard program by establishing minimum annual volumes of various renewable fuel categories to be introduced into the U.S. transportation fuel supply. 42 U.S.C. § 7545(*o*)(2)(B)(ii). EPA then assigns a proportional share of these renewable fuel volumes to so-called obligated parties—fuel refiners or importers of U.S. transportation fuel—a share known as the Renewable Volume Obligation ("RVO"). *Id.* § 7545(*o*)(3)(B); 40 C.F.R. §§ 80.1406(b), 80.1407(a). EPA sets an RVO for each different category of renewable fuel: cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel. 40 C.F.R. § 80.1407.

Each obligated party complies by retiring Renewable Identification Number credits ("RINs") commensurate with their RVOs. 42 U.S.C. § 7545(*o*)(5); 40 C.F.R § 80.1427(a). Different RINs represent different kinds of renewable fuel. 40 C.F.R. §§ 80.1425, 80.1426. Although

obligated parties may acquire RINs by blending renewable fuel into transportation fuel, *id.* § 80.1429, EPA has also established "a market-based program through which parties can purchase and trade" RINs. *Wynnewood Refin. Co. v. EPA*, 77 F.4th 767, 774 (D.C. Cir. 2023) (citing 40 C.F.R. §§ 80.1401, 80.1425). "Parties acquire RINs and then demonstrate compliance with their renewable fuel obligations for the year by 'retir[ing]' (*i.e.*, submitting) them to EPA by the compliance filing deadline." *Id.* (citing 40 C.F.R. § 80.1427(a)) (alteration in original). Unused RINs carry over to the next calendar year. 40 C.F.R. § 80.1428(c).

EPA may grant an "exemption" to a "small refinery" from its RVOs for a particular year if that refinery shows "disproportionate economic hardship." 42 U.S.C. § 7545(*o*)(9)(B)(i); *see also id.* § 7545(*o*)(1)(K) ("small refinery" defined as a refinery with an average aggregate daily crude oil throughput for a calendar year of 75,000 barrels per day or less). Here, EPA granted 63 requests for SREs in full (100% exempted) and 77 requests for SREs in part (50% exempted) for compliance years 2016 through 2024. SRE Decisions at 1.

When EPA grants an SRE, it relieves the applicant of RVOs in whole or in part and returns any already-retired RINs for that

4

compliance year to the refinery. *Id.* at 20. A portion of those RINs, from 2023 and 2024, may be used again to meet outstanding obligations. *Id.* at 20–22. Collectively, the SRE exemptions relieve exempt refiners of approximately 1.4 billion in RIN compliance obligations for compliance years 2023 and 2024 alone. *Id.* at 1. This equates to approximately 11.4 billion gallons of exempted gasoline and diesel. *See* Ex. B, Declaration of David Ballenger ("Ballenger Decl.") ¶ 10. Including compliance periods between 2018 and 2022 raises that total to 5.34 billion RINs. SRE Decisions at 1.

## LEGAL STANDARD

Intervention here is governed by Federal Rule of Appellate Procedure 15(d), requiring the movant to file a motion for leave to intervene within 30 days after the petition for review was filed. The motion "must contain a concise statement of the interest of the moving party and the grounds for intervention." Fed. R. App. P. 15(d). "Because the Federal Rules of Appellate Procedure" are "silent on the subject" of the standard for intervention, this Court "appl[ies] the intervention standards of Civil Rule 24." *United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 432 (D.C. Cir. 2022).

5

Under Federal Rule of Civil Procedure 24(a), to intervene as of right, the movant must demonstrate that (1) the motion is "timely," (2) it has an "interest relating to the property or transaction that is the subject of the action," (3) the interest "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," and (4) the existing parties do not "adequately represent that interest"; in addition, this Court "require[s] a party seeking to intervene as of right to demonstrate Article III standing." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013) (quoting Fed. R. Civ. P. 24(a)); *see also IGas Holdings v. EPA*, 146 F.4th 1126, 1135 n.2 (D.C. Cir. 2025).[1]

Permissive intervention under Federal Rule of Civil Procedure 24(b) requires (1) a "timely motion," (2) "a claim or defense that shares with the main action a common question of law or fact," and (3) a

---

[1] This Court has recognized that its precedent requiring putative intervenors to demonstrate Article III standing even when seeking the same relief as existing parties "is in tension" with *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020). *See Inst. S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025).

6

demonstration that intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b).

## ARGUMENT

The Coalition meets the criteria for intervention as of right and has Article III standing. The Coalition in any event also meets the criteria for permissive intervention.

### I.    The Motion Is Timely

The Coalition seeks to intervene in Case No. 25-1226 (*Growth Energy*) and Case No. 25-1228 (*Renewable Fuels Association*).[2] Both were filed on October 24, 2025. Therefore, this motion for leave was filed within the 30-day period specified in Federal Rule of Appellate Procedure 15(d).

### II.    The Coalition Has an Interest in the SRE Decisions

The Coalition, as an association of different domestic petroleum refiners and importers subject to the Renewable Fuel Standard, seeks to

---

[2] Circuit Rule 15(b) states that a motion to intervene "will be deemed a motion to intervene in all cases before this court involving the same agency action or order, including later filed cases, unless the moving party specifically states otherwise…." D.C. Cir. R. 15(b). The Coalition only seeks leave to intervene in the two cases specifically identified herein.

7

vindicate the interests of its members that will be harmed by the SRE Decisions.

For example, several companies in the Valero family are Coalition members. Those companies own and operate domestic refineries located in Texas, Louisiana, Oklahoma, Tennessee, and California. *See* Ballenger Decl. ¶¶ 5, 13. They also import finished fuel products into the United States market. *Id.* ¶ 5. Accordingly, they are subject to RVOs under the Renewable Fuel Standard. This means that these companies must obtain and retire enough RINs to satisfy their RVOs for each fuel category. *Id.* ¶¶ 6–7.

As EPA has long recognized, "refiners recover the cost of the RINs they purchase by passing that cost along in the form of higher prices for the petroleum based fuels they produce." *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 649 (D.C. Cir. 2019) (quotation marks omitted); *see also* 90 Fed. Reg. 45,007, 45,015 (Sept. 18, 2025) ("We do, however, expect that, on average at the national level, obligated parties would pass on the costs of purchasing additional RINs to consumers[.]"); SRE Decisions at 4 ("the costs of RINs used for compliance with the RFS program are the

same for all obligated parties and are passed through by all obligated parties to consumers").

The refineries receiving the SREs therefore receive enormous benefits within this system, amounting to 1.4 billion RINs that will necessarily grant them an unfair advantage in competing with members of the Coalition, as described below. Based on publicly available data, the refineries receiving the SREs are in Alabama, Arkansas, California, Colorado, Indiana, Louisiana, Mississippi, Montana, North Dakota, Oklahoma, Pennsylvania, Texas, Utah, Washington, West Virginia, Wisconsin, and Wyoming. Ballenger Decl. ¶ 12. These exempt refineries supply petroleum products to all five regional gasoline and diesel markets (defined as Petroleum Administration for Defense Districts, or "PADDs"). *Id.* Coalition members sell gasoline and diesel into each of these PADDs, as well as nearly all of the listed States' local markets. *Id.* ¶ 13.

By forgiving the RIN obligations of the Coalition's members' marketplace rivals, EPA is unfairly (and unnecessarily) subsidizing competitors of the Coalition's members. Exempt refiners can respond to this subsidy in one of two ways, or both, any of which will harm the members of the Coalition. First, refiners receiving SREs may continue to price

9

gasoline and diesel at market levels, but without incurring RIN costs. Ballenger Decl. ¶ 18. In that case, these exempt refiners will obtain product margins that are higher than they otherwise would be, harming the margins of non-exempt refiners. *Id.* These costs are substantial. For example, in 2024, the Valero family companies' RVO compliance cost was approximately $3.75 per barrel of oil, and in 2023 it was approximately $7.00 per barrel, compared to the cost of West-Texas Intermediate crude oil of about $76 per barrel over the same timeframe. *Id.* ¶ 15. Relieving exempt refiners of these compliance costs gives them a direct competitive advantage, harming the Coalition's members. *Id.* ¶ 18.

In the alternative, EPA's SRE subsidy allows exempt refiners to reduce the price of their gasoline and diesel products to undercut the price of Coalition members' products in the markets where they compete. Ballenger Decl. ¶ 19. With lower prices, the exempt refiners can thus aggressively pursue additional market share at the expense of the Coalition's members. *Id.* This, in turn, forces Coalition members to reduce prices in order to remain competitive and maintain their market share. Whether Coalition members, as a result, lose market share or have to discount

10

their prices to avoid that outcome, they suffer cognizable harm as a result of the SRE subsidy.

Both scenarios—regardless of which any particular exempt refiner chooses—harm the profits of members of the Coalition.

Coalition members are also harmed by the SRE Decisions because EPA increases future-year RVOs to account for anticipated future SREs, which are projected based on past SREs. Ballenger Decl. ¶ 23. Moreover, EPA has further proposed reallocating some or all of the RVOs exempted by the SRE Decisions for the 2023 and 2024 compliance years to obligated parties in future years. *Id.* ¶ 21. The increased future-year RVOs harm the Coalition's members by forcing them to shoulder part of the Renewable Fuel Standard compliance burden avoided by SRE recipients, a direct pocketbook harm, and one that exacerbates the competitive disadvantage the Coalition's members face from the SREs. *Id.* ¶¶ 21–23.

In sum, the SRE Decisions will harm Coalition members' competitive position in the refining business through higher costs, reduced margins, diminished market share, reduced demand, and—because of all this—will also harm its relationships with investors and lenders. Ballenger Decl. ¶¶ 17–20, 22. The SREs may also cause Coalition members

11

imminent pocketbook harm by increasing their Renewable Fuel Standard compliance costs in future years. *Id.* ¶¶ 21, 23.

These harms are more than sufficient to establish an interest under Federal Rule of Civil Procedure 24(a). Further, the competitive harms caused by EPA to members of the Coalition also establish associational standing under Article III. The competitive harms injure the Coalition's members, and vacating the SREs would restore natural price competition in the markets where the Coalition's members and the exempt refiners compete. *See La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) ("increased price competition" is "sufficient to establish injury in fact," is traceable to an agency order affecting "market-based rates," and vacatur of that order would redress the injury); *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1015–16 (D.C. Cir. 2016) (association had Article III standing to challenge regulation allowing imports that compete with members' products in the market); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1005–06 (D.C. Cir. 2014) (association had Article III standing to challenge favorable regulatory treatment of competitors).

In addition, and separately, Coalition members are the object of the Renewable Fuel Standard program because they are obligated parties, and they incur significant compliance costs under that program, both of which independently suffice to show standing here. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (when a litigant is the object of a regulatory regime, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it"). "[T]hose monetary costs are of course an injury." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (quotation marks omitted).

Because the Coalition's members have Article III standing, the Coalition has associational standing to intervene on their behalf. An organization demonstrates associational standing "when: (1) at least one of its members would have standing to sue in his or her own right; (2) 'the interests it seeks to protect are germane to the organization's purpose;' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members.'" *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). Here, Coalition members have demonstrated they

13

have Article III standing to challenge the SRE Decisions in their own right; the Coalition is intervening to vindicate its members' interests in a free and fair market for refined fuels; and the Coalition is not asserting any claim, or seeking any relief, requiring individual member participation. *See generally* Jones Decl.; Ballenger Decl.

## III. The Disposition of This Case Could Impair the Coalition's Interest in Fair Competition

The Coalition meets the third factor for intervention as of right under Federal Rule of Civil Procedure 24(a), where courts look to "the 'practical consequences' of denying intervention." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003). Further, this factor is satisfied upon demonstrating Article III standing. *Cf. Roeder v. Islamic Rep. of Iran*, 333 F.3d 228, 233–34 (D.C. Cir. 2003). Where the litigation's disposition will lead to a "loss of revenues," this factor is satisfied as well. *Fund for Animals*, 322 F.3d at 735. As discussed above, should the SRE Decisions be upheld, the Coalition members' competitors will gain significant market advantages through the effective subsidy the SREs provide to the exempt refiners, and Coalition members may further suffer increased compliance costs. *See* Ballenger Decl. ¶¶ 16–24. The Coalition should be allowed to intervene here to protect its members' interests in

fair market competition and lower compliance costs that may otherwise be lost without its participation.

## IV.  Petitioners May Not Adequately Represent the Coalition's Interests

Renewable fuel trade associations are unlikely to adequately represent the interests of the Coalition's members, who own and operate petroleum refineries. Rule 24(a) allows for intervention as of right "unless existing parties adequately represent" the movant's "interest." Fed. R. Civ. P. 24(a). "This burden … is not onerous," as the "applicant need only show that representation of his interest 'may be' inadequate, not that representation will in fact be inadequate." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)); *see also United States v. AT&T Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980) ("This court has held that the burden is on those opposing intervention to show that representation for the absentee will be adequate.").

Petitioners Growth Energy and the Renewable Fuels Association both represent renewable fuel manufacturers, not petroleum refiners or importers. *See Growth Energy v. EPA*, 5 F.4th 1, 11 (D.C. Cir. 2021) (representing the interests of renewable fuel manufacturers); *Renewable*

15

*Fuels Ass'n v. EPA*, 948 F.3d 1206, 1230 (10th Cir. 2020) ("a trade association for the ethanol industry"). Although the Coalition and the Petitioners may have the same ultimate object in this litigation—invalidating the SREs—their overall interests diverge significantly. Petroleum refiners and importers, including the Coalition's members, "compete with biofuel producers in the motor vehicle fuel market because ethanol is a substitute for the traditional petroleum-based components of gasoline." *Am. Fuel & Petrochem. Mfrs. v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021); *see also* Mot. of Growth Energy to Intervene in Support of Respondent at 8–9, *REH Co. v. EPA*, No. 25-1180 (D.C. Cir. Sept. 29, 2025), Doc. No. 2137689 ("RFS standards function as a barrier to competition from petroleum producers for the content of the nation's transportation fuel[.]"). They also play different roles in the Renewable Fuel Standard program, which gives rise to competing incentives. Renewable fuel producers generate and sell RINs and so generally seek to increase RIN revenue, while petroleum refiners are obligated to retire RINs and so generally seek lower RIN costs. Petitioners and the Coalition also likely have different views of reallocation—with Petitioners favoring more and the Coalition favoring less—which could affect their interests in continuing

16

litigation in the event that EPA fully or partially reallocates the 2023 and 2024 SRE-exempted RVOs.

Federal Rule of Appellate Procedure 15(a)'s notice pleading standard clouds questions of representation, interest, and strategy, as Petitioners need not divulge their arguments until after Rule 15's 30-day deadline for intervention has run. Furthermore, EPA does not allow for public comment on any proposal to grant, deny, or partially grant SREs. The parties' positions and arguments on the SREs in particular, and interpretations of the Renewable Fuel Standard program in general, therefore cannot be compared at this time. Thus, although the Coalition and Petitioners may be aligned with respect to the ultimate outcome of these petitions for review, their legal arguments about the Renewable Fuel Standard program may diverge significantly, given their diverging interests. These differing interests satisfy the light burden of showing that Growth Energy and Renewable Fuels Association "may be inadequate" representatives of the Coalition's interests. *Trbovich*, 404 U.S. at 538 n.10 (quotation marks omitted).

17

## V.    The Coalition Also Satisfies Permissive Intervention

In the alternative, the Coalition meets all three requirements for permissive intervention. First, as discussed above, the Coalition's motion is timely under Federal Rule of Appellate Procedure 15(d). Second, the Coalition shares a common claim with the Petitioners in that all seek to challenge the SRE Decisions as unlawfully granted.[3] Third, intervention at this juncture will not unduly delay the proceedings, as the Rule 15(d) deadline has not passed and there is no briefing schedule.

## <u>CONCLUSION</u>

For the foregoing reasons, the Coalition respectfully requests that the Court grant its motion to intervene in support of the Petitioners in Case Nos. 25-1226 and 25-1228.

---

[3] It may be an "open question" whether a permissive intervenor must demonstrate Article III standing. *Mayor & City Council of Baltimore v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 738 F. Supp. 3d 1, 12 (D.D.C. 2024). Nonetheless, as discussed above, the Coalition has demonstrated that it has Article III standing to challenge these SRE Decisions.

18

Dated: November 24, 2025

Respectfully submitted,

/s/ Michael Buschbacher
Michael Buschbacher
  *Counsel of Record*
James R. Conde
James R. Wedeking
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Washington, DC 20006
202-955-0620
mbuschbacher@boydengray.com

*Counsel for Coalition to Preserve Refined Fuel Markets*

19

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that:

1. The motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 3,442 words, excluding the exempted portions.

2. This motion complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) as it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Michael Buschbacher
Michael Buschbacher

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of November, 2025, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

<u>/s/ Michael Buschbacher</u>
Michael Buschbacher