# Ex. B

ORAL ARGUMENT NOT YET SCHEDULED

**IN THE UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT**

GROWTH ENERGY,

     *Petitioner,*

  v.

ENVIRONMENTAL PROTECTION
AGENCY,

     *Respondent.*

                Nos. 25-1226; 25-1228
                (consolidated with
RENEWABLE FUELS ASSOCIATION,   Nos. 25-1180, *et seq.*)

     *Petitioner,*

  v.

ENVIRONMENTAL PROTECTION
AGENCY,

     *Respondent.*

**DECLARATION OF DAVID BALLENGER**

   I, David Ballenger, declare under penalty of perjury that the following is true
and correct to the best of my knowledge:

   1.  I am the Vice President, Risk Management & Trading Support in the
Risk Management & Trading Controls division for the Valero family of compa-
nies, including those that are members of the Coalition to Preserve Refined Fuel
Markets (collectively, "Coalition Members").[1] In this role, I am responsible for

---

[1] Valero Refining and Marketing Company; Ultramar Inc.; Diamond Shamrock Refining
Company, L.P.; The Premcor Refining Group Inc.; Valero Refining Company-Oklahoma;
Valero Marketing and Supply Company.

supporting Coalition Members' commercial trading operations via contract management, risk mitigation, financial analysis, and compliance reporting. My role requires that I understand the financial impacts various commercial and market dynamics have on Coalition Members' financial statements and stated corporate metrics. Through this role, I have acquired insight into how the Renewable Fuel Standard Program ("RFS") impacts Coalition Members' operations.

2.    I am also familiar with the Environmental Protection Agency ("EPA")'s August 2025 Decisions on Petitions for Small Refinery Exemptions ("SRE Decisions") under the RFS, at issue in these petitions for review.[2]

3.    As explained below, the SRE Decisions place non-exempt refiners such as Coalition Members at a competitive disadvantage. Furthermore, because EPA takes into account past SRE Decisions when determining future renewable volume obligations for non-exempt refiners under the RFS and has announced plans to reallocate the exempted volumes to non-exempt refiners in the future, the SRE Decisions expose Coalition Members to additional regulatory and financial burdens under the RFS. As a result, and as explained further below, the SRE Decisions will cause competitive and pocketbook injuries to Coalition Members' refining and marketing business segments that would be redressed by a judgment from this Court vacating those Decisions.

4.    In support of my declaration, I am attaching a report prepared by

---

[2] EPA, EPA-420-R-25-010, *August 2025 Decisions on Petitions for RFS Small Refinery Exemptions* (Aug. 2025), https://www.epa.gov/system/files/documents/2025-08/420r25010.pdf ("SRE Decisions").

Charles River Associates evaluating the adverse competitive effects of the SRE Decisions on non-exempt refiners as Exhibit A to this declaration.[3]

### A.    RFS Compliance

5.    Coalition Members own and operate refineries producing gasoline and diesel for use in transportation fuel within the contiguous United States. Coalition Members also import gasoline and diesel for use in transportation fuel within the contiguous United States. As both refiners and importers of transportation fuel throughout the contiguous United States, Coalition Members are obligated parties under the RFS. 40 C.F.R. § 80.2.

6.    As a result, Coalition Members must comply with a proportional share of renewable fuel volume obligations ("RVOs") for each of the nested renewable fuel categories that must be blended into transportation fuel under the RFS (i.e., cellulosic biofuel, biomass-based biofuel, advanced biofuel, and total renewable fuel). *See* 40 C.F.R. §§ 1406(b), 1407(a); *see also EPA v. Calumet Shreveport Refin., L.L.C.*, 145 S. Ct. 1735, 1744 (2025).

7.    Coalition Members must do so by retiring a sufficient number of Renewable Identification Number credits ("RINs") to cover their obligations. *See* 40 C.F.R. § 80.1427. RINs are generated when a renewable fuel producer produces a gallon of renewable fuel or a gallon of renewable fuel is imported, and one RIN represents an ethanol-equivalent gallon of renewable fuel. *See* 40 C.F.R.

---

[3] Ex. A, Charles River Associates, *Economics and Impacts of Small Refinery Exemptions: Evaluating the Impacts of Potential EPA Decisions* (Oct. 2025).

§ 80.1426. RINs may be traded, including with and by non-obligated parties (e.g., fuel blenders, brokers, traders). Obligated parties may obtain RINs by (1) blending renewable fuel into transportation fuel (i.e., gasoline or diesel), heating oil, or jet fuel, thereby "separating" the RIN from the renewable fuel; or (2) purchasing RINs. RINs may be used to demonstrate compliance with the RFS for the year in which they are generated or the following year.

8.      Under the RFS, EPA may grant small-refinery exemption petitions ("SREs") exempting small refiners from the RVO for any compliance year "for the reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i); *Calumet Shreveport Refin.*, 145 S. Ct. at 1744.

**B.     The SRE Decisions**

9.      In the SRE Decisions at issue here, EPA decided 175 SRE petitions for the 2016 to 2024 compliance years. EPA granted 63 SREs in full (100%), 77 SREs in part (50%), denied 28 SREs in full, and determined 7 petitions were ineligible.[4]

10.     According to EPA, the SRE Decisions exempt 11.4 billion gallons of gasoline and diesel from the RFS for the 2023 and 2024 calendar year obligations, alone, resulting in 1.4 billion RINs no longer needing to be retired by exempt refiners for these compliance years.[5]

---

[4] SRE Decisions at 1.

[5] *See Renewable Fuel Standard (RFS) Program: Standards for 2026 and 2027, Partial Waiver of 2025 Cellulosic Biofuel Volume Requirement, and Other Changes; Supplemental Notice of Proposed Rulemaking*, 90 Fed. Reg. 45,007, 45,012 (Sept. 18, 2025) ("Reallocation Proposal").

11.    EPA has proposed to reallocate some or all of these obligations to other non-exempt refiners in future compliance years.[6]

### C.    Direct Competitive Advantage of SRE Recipients

12.    Although only certain SRE data is made publicly available by EPA, it is my understanding that the SRE Decisions granted full or partial SREs to refiners located in Alabama, Arkansas, California, Colorado, Indiana, Louisiana, Mississippi, Montana, North Dakota, Oklahoma, Pennsylvania, Texas, Utah, Washington, West Virginia, Wisconsin, and Wyoming.[7] These refineries therefore have footprints in, and supply transportation fuel to, all five regional gasoline and diesel markets or PADDs (Petroleum Administration for Defense Districts) within the United States: East Coast, Midwest, Gulf Coast, Rocky Mountain, and West Coast.[8]

13.    Coalition Members' domestic refineries are located in Texas, Louisiana, Oklahoma, Tennessee, and California, but Coalition Members compete in all of these geographic markets for transportation fuel (gasoline and diesel). In 2025 alone, Coalition Members collectively sold transportation fuel into each of these regional U.S. markets and in almost all of the States where the refineries

---

[6] *See id.* at 45,014.

[7] EPA, *Table SRE-3: Small Refinery Exemption Petitions Submitted July 1, 2022 or Later,* https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions (last visited Nov. 21, 2025).

[8] *See* U.S. Energy Info. Admin., *PADD Regions Enable Regional Analysis of Petroleum Product Supply and Movements,* https://www.eia.gov/todayinenergy/detail.php?id=4890 (last visited Nov. 22, 2025).

receiving SREs under the SRE Decisions are located. In other words, each recipient of an SRE competes in the same product and geographic markets as Coalition Members.

14.      EPA has determined that "the costs of RINs used for compliance with the RFS program are the same for all obligated parties and are passed through by all obligated parties to consumers."[9] EPA further explains that this "RIN cost passthrough" leads to "higher prices on the gasoline and diesel subject to the [RVO]."[10]

15.      RIN cost is a substantial portion of a gasoline or diesel refinery's cost. For example, Coalition Members' RVO cost in 2024 was approximately $3.75 per barrel of oil and in 2023 it was approximately $7.00 per barrel of oil, compared to the cost of a West-Texas Intermediate barrel of crude oil of about $76 over that same period.[11]

16.      For that reason, in a competitive sector such as gasoline and diesel refining, SREs have predictable adverse effects on non-exempt refiners. As Charles River Associates explains: "SREs can drastically lower compliance costs for exempted refiners, thus increasing potential volumes and increasing margins. Larger refineries are indirectly impacted by SREs, with the degree also driven by how the SREs are implemented. In general, large refineries can see their

---

[9] SRE Decisions at 4.

[10] *Id.* at 11.

[11] Valero Energy Corp, FY 2024 10-K, at 48, 54, https://investorvalero.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=18224733.

compliance costs either remain or increase, while their competitive positions and sales volumes are diminished when competing with small refineries that receive exemptions." Ex. A, at 15.

17.     In other words, as a result of the SRE Decisions, the regulatory cost of Coalition Members' rivals will fall, and one of two things, or both, will predictably happen—any of which will cause competitive harm to Coalition Members.

18.     On the one hand, exempt refiners will continue pricing gasoline and diesel at market price levels without having to absorb the cost of RFS compliance. In this scenario, they will obtain higher product margins than they would have without the SREs, a cost advantage that will competitively harm Coalition Members and other non-exempt competitors. Ex. A, at 26–27. For example, according to an analysis by Charles River Associates for PADD 3, under the RFS, "granting SREs ... cause[s] average large refinery margins to decline from 13.2¢/gal to 8.9¢/gal." *Id.* at 27. In economic terms, by lowering the cost of Coalition Members' rivals, SRE Decisions allow exempt refiners to capture a greater share of the available economic rent (the market price minus the opportunity cost). Without the SRE Decisions, by contrast, Coalition Members would not suffer this competitive harm.

19.     On the other hand, exempt refiners may reduce the price of gasoline and diesel. This, in turn, would force non-exempt refiners such as Coalition Members to give up market share or to reduce prices accordingly, harming the profit margins of non-exempt refiners. Without the SRE Decisions, by contrast,

Coalition Members would not suffer this competitive harm.

20.    In any case, the SRE Decisions will adversely affect Coalition Members' businesses and in particular their competitive positions in the refining industry.

### D.    The Potential Impact of Reallocation

21.    I am also familiar with EPA's Reallocation Proposal.[12] EPA's proposal would reallocate some or all RVOs exempted by the SRE Decision for the 2023 and 2024 compliance years to non-exempt obligated parties, including Coalition Members. If finalized, the Reallocation Proposal would directly harm Coalition Members by forcing them to shoulder part of the RFS compliance burden avoided by SRE recipients, a direct incremental compliance cost for Coalition Members. Without the SRE Decisions, by contrast, Coalition Members would not suffer this additional pocketbook harm.

22.    This increased compliance cost would also further exacerbate the competitive disadvantages to Coalition Members previously described herein. *See* Ex. A, at 2 ("Reallocations further alter competitive dynamics between small and large refineries and increase large refiner and consumer costs relative to scenarios with lower or no reallocations."). Without the SRE Decisions, by contrast, Coalition Members would not suffer this competitive harm.

23.    Furthermore, EPA already includes, as part of its RVO, projections of future SREs the agency expects to grant for that compliance year. Because EPA

_____

[12] 90 Fed. Reg. 45,007.

bases its projections of future SREs on past SREs, the SRE Decisions will harm Coalition Members by inflating these projections and increasing Coalition Members' regulatory costs even without the Reallocation Proposal. Without the SRE Decisions, by contrast, Coalition Members would not suffer this additional pocketbook harm.

24.    In short, the SRE Decisions tilt market dynamics in favor of exempt refiners to the detriment of the margins of Coalition Members and other non-exempt refiners. The resulting competitive disadvantages experienced by Coalition Members will only be further amplified in the event of full or partial reallocation of the exemption volumes, increasing Coalition Members' compliance costs. The SRE Decisions harm Coalition Members even in the absence of reallocation by inflating future projections of exempt volumes in the RVOs, thereby increasing the RVO share Coalition Members must shoulder. This will negatively affect Coalition Members' business operations and profitability as described herein.

25.    All of these injuries arise because of EPA's improper SRE Decisions and would be avoided or substantially ameliorated if the SREs Decisions were set aside in whole or in part.

Dated: November 24, 2025

David Ballenger

# Exhibit A

## to Ballenger Declaration



# Economics and Impacts of Small Refinery Exemptions

*Evaluating the impacts of potential EPA decisions*

October 2025

**Prepared for:**

Valero Services, Inc.

**Prepared by:**

Charles River Associates

October 2025                                              Charles River Associates

# Table of contents

1.  Executive Summary ........................................................................................................... 1

2.  Background ...................................................................................................................... 2
    2.1.  Overview of the Renewable Fuel Standard (RFS) .................................................. 2
    2.2.  Overview of Renewable Identification Numbers (RINs) ......................................... 4
    2.3.  Small Refinery Exemptions (SREs) ...................................................................... 7
    2.4.  Recent EPA Decisions and Proposals ................................................................ 13

3.  Key Economic Concepts ................................................................................................ 15
    3.1.  Economic Impacts of the RFS .......................................................................... 15
    3.2.  Economic Impacts of SREs .............................................................................. 15
    3.3.  Small Refinery Economics and Competitive Positioning .................................... 17

4.  Evaluating SRE and Allocation Impacts ........................................................................ 23
    4.1.  Data & Methodology ........................................................................................ 23
    4.2.  SRE Decision Impact Analysis (Q1 2025) ......................................................... 25
    4.3.  RIN Price Sensitivities ..................................................................................... 27

## Disclaimer

The conclusions set forth herein are based on independent research and publicly available material. The views expressed herein are the views and opinions of the authors and do not reflect or represent the views of Charles River Associates or any of the organizations with which the authors are affiliated. Any opinion expressed herein shall not amount to any form of guarantee that the authors or Charles River Associates has determined or predicted future events or circumstances and no such reliance may be inferred or implied. The authors and Charles River Associates accept no duty of care or liability of any kind whatsoever to any party, and no responsibility for damages, if any, suffered by any party as a result of decisions made, or not made, or actions taken, or not taken, based on this paper. Detailed information about Charles River Associates, a trademark of CRA International, Inc., is available at www.crai.com.

Copyright 2025 Charles River Associates

# 1.    Executive Summary

Small Refinery Exemptions (SREs) to the US Renewable Fuel Standard (RFS) have become a focal point of recent EPA actions and public debate. SREs allow certain small refineries to avoid renewable fuel blending obligations. They can impact market prices and outcomes for several important industries and for transportation fuel consumers in many ways, with the impacts depending on two critical EPA decisions:

1. ***Granting SREs*** – EPA must decide the scale, timing, and distribution of SREs. In August 2025, after years of delays, litigation, and changes in policy and regulatory interpretation, the EPA issued decisions on 175 SRE petitions and indicated a going-forward method for future SRE decisions. The decisions were of significant scale, extending across eight compliance years (2016-2024), and covered 38 refineries. The decisions included full and partial SREs, as well as denials and determinations of ineligibility.

2. ***Allocating SRE volumes*** – EPA must decide whether and how to consider SREs in setting overall renewable fuel volume standards. In setting the renewable fuel volume requirements for obligated parties (or "RVOs"), the EPA can decide to either keep the percentage targets at levels set before granting SREs or "reallocate" SRE volumes. Reallocation involves setting the overall renewable fuel volume target at a level that essentially ignores the SREs, thus raising the percentage targets for the remaining obligated parties. In September 2025, the EPA proposed reallocation of recent SRE volumes and is seeking comment on their scale and approach.

These decisions are coming under the backdrop of another major EPA decision on the RFS – the setting of the RVO for compliance years 2026 and 2027. EPA significantly expanded the proposed volume requirements to their highest ever level, based on an expectation for a significant increase in domestic biodiesel and renewable diesel production. The proposal also lowers the crediting of imported biofuels, among other changes.

This report examines the impacts of SREs and various levels of reallocations of SRE volumes on fuel markets, small and large refineries, compliance credit (or "RIN") prices, and ultimately refined fuel prices. It considers the EPA-proposed volumes and other proposed RFS changes. It applies economics and uses real-world refinery data to demonstrate the impacts of SREs and reallocations to specific markets and refinery types.

We first explore two key considerations for understanding SRE and reallocation decision impacts:

- *Small vs. large refinery economics* – There has been a shift in competitive positioning in key US refined fuel markets since the conditions prior to 2011 that had influenced SRE decision factors. The shift was mostly driven by refinery locations relative to changing crude production sources. Many small refineries can be lower cost than larger refineries, influencing the benefits and costs of SRE and allocation decisions.

- *Uncertain and volatile biofuel and RIN supply curves* – RIN prices have swung significantly based on RVO decisions and market conditions. With a leap upward in the RVO, there is increased risk of tipping points in biofuel and RIN prices that can lead to outsized impacts of reallocation decisions. This is particularly true as policy shifts can drastically alter conditions assumed by EPA in its decisions, such as a historically low $0.60 RIN price relied on in its recent RVO impact analysis.

The following are some of our key findings.

- *In regions of the country where large and small refineries compete directly (such as the Gulf Coast, Texas/Oklahoma, and the Mountain West),*

  - SREs significantly disrupt the refinery supply curves, leading many small refineries that are already lower cost than larger refineries to fully capture SREs as increased margins. We provide an example where regional small refinery margins increase by 100% as a result of SREs.

  - If SREs are reallocated in these markets, large refiners may be unable to pass-through additional costs and therefore reduce production of obligated fuels.

- *In markets with few and mostly niche small refineries (such as the East Coast),*

  - Increased obligation costs for large refineries, driven by reallocations, can more directly lead to higher transportation fuel costs for consumers. The impact can be significant in high RIN price scenarios.

- *In general,*

  - These impacts are amplified when the EPA, as it did in the latest RVO, sets volume targets that strain renewable fuel production and put upward pressure on RIN prices.

  - Reallocations further alter competitive dynamics between small and large refineries and increase large refiner and consumer costs relative to scenarios with lower or no reallocations. The extent of the impact cannot be well-predicted in advance of compliance years.

The report begins with a background on the RFS and SREs (Section 2). We then provide an economic overview of the impacts of the RFS, SREs, and reallocation decisions (Section 3). Finally, we present an analysis of refining data to demonstrate likely impacts and outcomes of various EPA decisions in a specific market (Section 4).

## 2.    Background

### 2.1.    Overview of the Renewable Fuel Standard (RFS)

The United States Congress established the Renewable Fuel Standard (RFS) via the Energy Policy Act of 2005 as a market-based policy mechanism to increase uptake of renewable fuels in the transportation sector. Administration of the program rests with the U.S. Environmental Protection Agency (EPA) under authority granted by Section 211(o) of the Clean Air Act.[1] The RFS sets forth four categories of renewable fuels - total renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel (BBD) - and mandates annual targets (Renewable Volume Obligations, or RVOs) for the volume of each fuel that must be blended into the total transportation fuels pool. Obligated refiners and importers of gasoline or diesel fuel are required to retire Renewable Identification Number credits (RINs) to demonstrate compliance with blending requirements.

Calculating national-level and refinery-level RVOs is a three-step process:

1. Since 2002, the EPA has been responsible for promulgating annual RVOs informed by a broad review of national interests. (Prior to 2022, RVOs were established by the

---

[1] Clean Air Act Text (2025), COMPS-8160.pdf

Energy Independence and Security Act of 2007.) RVO targets for each renewable fuel category are denominated in RINs, which are equivalent to a gallon of ethanol retired. For example, the EPA set a target of 3.35 billion RINs of biomass-based diesel to be blended in 2025.[2]

2. The EPA uses data from the Energy Information Administration's Annual Energy Outlook to calculate annual percentage standards. The RVO target for each renewable fuel category is divided by the projected and obligated national production of gasoline and diesel. For the 2025 RVO percentage standard, the EPA estimated an obligated gasoline and diesel volume of 189.53 billion gallons, leading to a biomass-based diesel percentage standard of 3.15%.[3]

3. Obligated parties multiply each percentage standard by the sum of all non-renewable gasoline and diesel they produce or import in a year to calculate their refinery-level RVO obligations. Keeping with our prior example, an obligated refinery that produces one billion gallons of gasoline and diesel in a year must retire 31.5 million D4 RINs.

RVOs for each renewable fuel category trended upward over the past decade. Given stagnant gasoline and diesel production figures, consistent with demand trends, a rise in the associated percentage standards is also observed. Table 1 below shows percentage standards for obligated parties, as set by the EPA, for compliance years 2017 through 2025.

**Table 1: RVO Percentages by Category, 2017 through 2025.**

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Cellulosic Biofuel (%) | 0.17 | 0.16 | 0.23 | 0.32 | 0.33 | 0.35 | 0.48 | 0.59 | 0.81 |
| Biomass-Based Diesel (%) | 1.67 | 1.74 | 1.73 | 2.30 | 2.16 | 2.33 | 2.58 | 2.82 | 3.15 |
| Advanced Biofuel (%) | 2.38 | 2.37 | 2.71 | 2.93 | 3.00 | 3.16 | 3.39 | 3.79 | 4.31 |
| Total Renewable Fuel (%) | 10.70 | 10.67 | 10.97 | 10.82 | 11.19 | 11.59 | 11.96 | 12.50 | 13.13 |

[2] EPA, Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes - Regulatory Impact Analysis (EPA-420-R-23-015, June 2023), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1017OW2.pdf

[3] The EPA slightly adjusts the AEO forecast. See EPA, Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes - Regulatory Impact Analysis (EPA-420-R-23-015, June 2023), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1017OW2.pdf, and EPA, Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes, Final Rule., https://www.govinfo.gov/content/pkg/FR-2023-07-12/pdf/2023-13462.pdf

October 2025                                                      Charles River Associates

## 2.2.   Overview of Renewable Identification Numbers (RINs)

Compliance with RVO obligations is achieved by retiring RINs. A RIN is generated whenever a registered producer or importer creates a given quantity of renewable fuel, typically a gallon. Once that fuel is blended into gasoline or diesel, the RIN can be separated from it and traded as a credit. RINs may be used for compliance in the year they are generated or carried over into the following year, subject to a 20% limit on how much of an obligation can be met with prior-year RINs.[4] Finally, RINs are retired at the end of the compliance year to officially fulfill RVO obligations.

The purpose of the RIN system is to introduce flexibility, allowing firms that neither produce nor blend renewable fuels to satisfy their obligations under the RFS. There are five kinds of RINs, listed from lower-carbon reduction intensity to higher-carbon reduction intensity: D3 and D7 RINs represent cellulosic biofuels, D4 represents biomass-based diesel, D5 represents advanced biofuels, and D6 represents conventional renewable fuels. Importantly, lower-carbon RINs can satisfy higher-carbon RIN obligations, which creates economic relationships between RIN types. The pyramid below depicts how the five RIN types align within the four nested RVO categories under the Renewable Fuel Standard, using the proposed 2025 RVO percentage obligations by the EPA.

**Figure 1: 2025 EPA Final Obligation for the Four RVO Categories[5]**



---

[4] EPA, Questions and Answers on the Renewable Fuel Standard Program.
https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1001T9Z.pdf

[5] United States: National Archives and Records Administration: Office of the Federal Register and United States: Environmental Protection Agency, "Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes. Part II: Rules and Regulations," *Federal Register. Vol. 88, No. 132*, Office of the Federal Register, National Archives and Records Administration, July 12, 2023, 44191–669.

Impacts of Small Refinery Exemptions

October 2025                                                                 Charles River Associates

The size and interconnectedness of RIN markets, along with expectations about fuel demand and regulatory behavior, are the primary drivers of RIN prices. In 2024, the total RIN market was valued at more than $19.8 billion.[6] Prices are largely determined by the interaction of statutory mandates with the "blend wall," the practical limit on ethanol use in the U.S. gasoline supply since most retail fuel is sold as E10. When the EPA's implied D6 requirement exceeds what can be absorbed at the blend wall, additional compliance cannot be met with corn ethanol alone. Instead, higher-cost advanced fuels such as biomass-based diesel (D4) and other advanced biofuels (D5) must be used, and their credits set the marginal price.

For 2024, the implied D6 mandate was 15.0 billion RINs, while EPA projected that only about 13.95 billion could be supplied through conventional ethanol given blend wall constraints.[7] The roughly one-billion-gallon shortfall had to be covered by advanced RINs cascading into the conventional pool, pulling D6 prices up toward D4 and D5 levels. As a result, compliance costs rose. Figure 2 shows that D4 and D6 prices have converged in recent years—recent EPA volume targets for renewable fuels have consistently exceeded the blend wall, putting upward pressure on D6 RIN prices and requiring the purchase of more expensive D4 RINs to meet RFS obligations. Notably, EPA used the average RIN prices from the period between April 2024 and March 2025 to estimate fuel price impacts in the Draft Regulatory Impact Analysis for its 2026-2027 RFS standards.[8]

---

[6] CRA calculation. Source: EPA, RIN Trades and Price Information. https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rin-trades-and-price-information

[7] EPA, Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes, Final Rule., https://www.govinfo.gov/content/pkg/FR-2023-07-12/pdf/2023-13462.pdf

[8] EEPA, Renewable Fuel Standard (RFS) Program - Standards for 2026 and 2027: Draft Regulatory Impact Analysis. https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P101HJXF.pdf

Impacts of Small Refinery Exemptions

October 2025                                                    Charles River Associates

**Figure 2: D4 and D6 Monthly Average Nominal Price ($/RIN)[9]**



Each obligated party must retire RINs according to the annual RVOs set by EPA. The above RIN prices, along with prices for the other categories of RINs, contribute to a total RIN cost per gallon of obligated fuel. Figure 3 plots the cost of compliance with the RFS per gallon of transportation fuel for 2024 through mid-2025.

---

[9] Source: EPA, RIN Trades and Price Information. https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rin-trades-and-price-information

October 2025                                                          Charles River Associates

**Figure 3: RIN cost per gallon of transportation fuel (2024 through mid-2025)**



The extent to which RVO compliance costs can be passed through to end consumers may vary depending on local markets and circumstances. The EPA's stated position is that the "market-based design of the RFS program and the RIN-based compliance system have equalized the cost of compliance among all market participants."[10] However, if RIN pass-through is incomplete, the resulting compliance burden affects refinery margins and has competitive implications. The US Fifth Circuit Court recently rejected the EPA's premise of complete pass-through in all markets in EPA vs. Calumet Shreveport Refining. ("*Calumet*") and declared that full passthrough is "is so implausible as applied to petitioners that it cannot be ascribed to a difference in view or agency expertise."[11] In another recent case, the D.C. Circuit Court of Appeals held that EPA must consider whether specific circumstances existed that prevented specific small-refinery petitioners from passing through all of their RINs costs.[12]

## 2.3. Small Refinery Exemptions (SREs)

### 2.3.1. History of SREs

The RFS provisions under the Clean Air Act allow small refineries, defined as those where the "average aggregate daily crude oil throughput for a calendar year does not exceed 75,000 barrels," to petition for a Small Refinery Exemption (SRE) from their RFS obligation. Petitioners must demonstrate that compliance with the RFS would cause "disproportionate economic hardship" (DEH).[13] The criteria for demonstrating DEH, and indeed the purpose of SREs

---

[10] Fifth Circuit Decision on Calumet, https://www.ca5.uscourts.gov/opinions/pub/22/22-60266-CV0.pdf

[11] Ibid.

[12] *Sinclair Wyoming Ref. Co. LLC v. EPA*, 114 F.4th 693 (D.C.Cir. 2024).

[13] Clean Air Act Text (2025), COMPS-8160.pdf

themselves, remains a topic of debate. Originally, the Energy Policy Act of 2005 included a blanket exemption of small refineries from the RFS between 2007 and 2010, with a planned 2009 DOE study to consider whether compliance with the SREs caused DEH for small refineries. The 2009 study found "no reason to believe that a competitive market would disproportionately disadvantage participants who purchase credits rather than generating them through blending renewable fuels," and recommended against extending any SREs.[14] However, recession conditions in the late 2000s led Congress to direct the DOE to revisit SREs. This second study, released in 2011, found that certain small refineries "suffer an economic hardship relative to an industry standard." The 2011 DOE Study also developed a scoring matrix for assessing DEH going forward. Meanwhile, the EPA extended SREs for 21 small refineries until 2012.[15]

Beginning in 2013, small refineries were required to petition for extension of their exemptions. The introduction of petitions, alongside implementation of the 2011 DOE Matrix, decreased the number of exemptions granted between 2013 and 2015. In 2016, a Senate report on appropriations criticized the EPA's application of the 2011 DOE Matrix. The report noted that "den[ying] hardship relief because the small refinery remained profitable notwithstanding the disproportionate economic impact" was "inconsistent with congressional intent."[16]

Following the report's release, the number of submitted and granted petitions sharply increased from 2016-2019. A wave of litigation on SRE decisions and rules followed: decisions of importance include Renewable Fuels Association v. EPA ("*RFA*") in 2020 and HollyFrontier Cheyenne Refining LLC v. Renewable Fuels Association ("*HollyFrontier*") in 2021. In 2022, the EPA moved to deny 105 petitions filed between the years 2016 and 2021, on the grounds that RIN prices can be recovered via pass-through. Notably, the EPA's rationale no longer depended upon the DOE scoring matrix from the 2011 DOE Study. This led to a Government Accountability Office report questioning the EPA's process and more litigation. Multiple small refiners sued the EPA, challenging its blanket denials of SREs. The condensed cases (Ergon v. EPA, "Ergon"; Sinclair Wyoming Refining LLC v. EPA, "Sinclair") successfully forced the EPA to vacate its previous blanket denials. There were no further decisions made on SRE petitions until August 2025.

Below is a table of SRE Petitions as things stood in August 2025 (Table 2). The backlog precipitating the EPA's August 2025 actions (discussed in 2.4.2) is evident.

---

[14] 2011 DOE Study, Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship (March 2011), https://www.epa.gov/sites/default/files/2016-12/documents/small-refinery-exempt-study.pdf

[15] Ibid.

[16] DEPARTMENT OF THE INTERIOR, ENVIRONMENT, AND RELATED AGENCIES APPROPRIATIONS BILL, 2017, CRPT-114srpt281.pdf

October 2025                                                                    Charles River Associates

Table 2: SRE Petitions filed by Year as of Aug 2025. [17]

| Compliance Year | Petitions Received | Petitions Granted | Petitions Denied | Petitions Declared Ineligible | Petitions With-drawn | Pending Petitions |
|---|---|---|---|---|---|---|
| 2011 | 42 | 24 | 13 | 3 | 2 | 0 |
| 2012 | 41 | 23 | 13 | 3 | 2 | 0 |
| 2013 | 30 | 8 | 18 | 0 | 4 | 0 |
| 2014 | 28 | 8 | 16 | 0 | 4 | 0 |
| 2015 | 28 | 7 | 17 | 1 | 3 | 0 |
| 2016 | 29 | 17 | 8 | 0 | 2 | 2 |
| 2017 | 37 | 34 | 1 | 0 | 1 | 1 |
| 2018 | 44 | 0 | 1 | 2 | 3 | 38 |
| 2019 | 34 | 0 | 1 | 2 | 2 | 29 |
| 2020 | 32 | 0 | 0 | 2 | 0 | 30 |
| 2021 | 24 | 0 | 4 | 0 | 0 | 20 |
| 2022 | 24 | 0 | 5 | 0 | 0 | 19 |
| 2023 | 24 | 0 | 4 | 0 | 0 | 20 |
| 2024 | 28 | 0 | 0 | 0 | 0 | 28 |
| 2025 | 8 | 0 | 0 | 0 | 0 | 8 |
| Total | 453 | 121 | 101 | 13 | 23 | 195 |

Notably, calculation of the percentage standards allows for exclusion of volumes of gasoline and diesel produced by exempted small refineries, though the EPA did not exercise this ability in setting 2022-2025 targets.[18]

The reason that SRE decisions are impactful on RFS outcomes is that small refineries produce a material share of US refined transportation fuels. Even though the majority of transportation fuels at the national level are produced by large refineries, the small refineries have very significant regional positions and are critical in price setting in key markets.

As shown in Figure 4, the United States is divided into five large regions, or PADDs,[19] each encompassing a distinct set of refineries and supply networks. Among them, PADD 3 (Gulf Coast) serves as the nation's primary refining hub, accounting for the majority of U.S. crude oil

---

[17] OAR US EPA, "RFS Small Refinery Exemptions," Other Policies and Guidance, accessed August 19, 2025, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions.

[18] EPA, Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes, Final Rule., https://www.govinfo.gov/content/pkg/FR-2023-07-12/pdf/2023-13462.pdf

[19] The Petroleum Administration for Defense Districts (PADDs) are geographic regions originally established by the U.S. government during World War II to coordinate and manage the distribution of petroleum products across the country. Although created for wartime logistics, the PADD system remains an essential framework used by the U.S. Energy Information Administration (EIA) and other federal agencies for data collection, reporting, and analysis of fuel production, distribution, and trade flows.

Impacts of Small Refinery Exemptions

October 2025                                                                                   Charles River Associates

processing and refined product exports. PADD 3 contains 53 operating refineries with a combined throughput capacity of approximately 10 million barrels per day (MMbbl/d).[20]

Some PADDs are further subdivided into refining districts (Figure 5) to reflect localized operational and logistical differences. For instance, PADD 3 comprises five refining districts: Texas Gulf Coast, Texas Inland, Louisiana Gulf Coast, North Louisiana–Arkansas, and New Mexico. While refining districts are important considerations, the concentration of refinery sizes by PADD illustrates differences across the US.

Figure 6 and Figure 7 illustrate the number of refineries and total crude input capacity within each PADD. The data show that the majority of small refineries (20 of 28) that filed SRE petitions for the 2024 compliance year (as of August 2025) were concentrated in PADDs 3 and 4.

- PADD 3: 9 out of 53 refineries filed SRE petitions, representing roughly 500 KBPD, or 5% of total regional crude input capacity.

- PADD 4: 11 out of 15 refineries filed petitions, accounting for approximately 432 KBPD, or 66% of that district's refining capacity.

---

[20] "Refinery Capacity Report - U.S. Energy Information Administration (EIA)," accessed October 14, 2025, https://www.eia.gov/petroleum/refinerycapacity/index.php.

Impacts of Small Refinery Exemptions

October 2025                                                        Charles River Associates

**Figure 4: US Petroleum Administration for Defense District (PADD).[21]**



**Figure 5: Refining Districts that make up PAD Regions.[22]**



---

[21] "PADD Regions Enable Regional Analysis of Petroleum Product Supply and Movements - U.S. Energy Information Administration (EIA)," accessed October 8, 2025, https://www.eia.gov/todayinenergy/detail.php?id=4890.

[22] Ibid

**Figure 6: Number of Refineries which filed SRE Petitions by PADD as of Aug 2025 for 2024.**[23]



|  | PADD 1 | PADD 2 | PADD 3 | PADD 4 | PADD 5 |
|---|---|---|---|---|---|
| SRE Filers | 2 | 3 | 9 | 11 | 3 |
| Other Refineries | 6 | 22 | 44 | 4 | 23 |

**Figure 7: Total Operating Capacity (B-Input) that filed SRE Petitions by PADD as of Aug 2025 for 2024.**[24]

|  | PADD 1 | PADD 2 | PADD 3 | PADD 4 | PADD 5 |
|---|---|---|---|---|---|
| SRE Filers | 33 | 147 | 463 | 432 | 82 |
| Other Refineries | 877 | 4,099 | 9,524 | 220 | 2,508 |

---

[23] US EPA, "RFS Small Refinery Exemptions."

[24] "Refinery Capacity Report Archives - U.S. Energy Information Administration (EIA)," accessed August 20, 2025, https://www.eia.gov/petroleum/refinerycapacity/archive/2024/refcap2024.php.

October 2025                                                                 Charles River Associates

## 2.4.   Recent EPA Decisions and Proposals

After years of moderately growing RVOs with inaction on pending SREs, the EPA produced a series of proposed rules and decisions in mid-2025 that could significantly impact the future of the RFS and create consequences across industry and households.

### 2.4.1.   Proposed Renewable Fuel Standards for 2026 and 2027 (June 2025)

In June 2025, the EPA published its proposed rule establishing the RFS volume and percentage requirements for 2026 and 2027, along with several programmatic updates collectively referred to as the "Set 2 Rule." As Table 3 below demonstrates, the EPA believes increased domestic production of renewable diesel will enable significantly higher RVO targets. The EPA acknowledges D4 RINs represent the marginal gallons of biofuel supplied to the market but claims its chosen targets "will continue to provide incentives for the production and use of BBD beyond the BBD volume requirement."[25]

Other major policy changes include:

1. A 50 percent reduction in RIN value for renewable fuels produced abroad or derived from imported feedstocks, effectively prioritizing domestically produced biofuels.

2. The elimination of e-RINs (renewable identification numbers generated from renewable electricity used in transportation), which had been part of earlier compliance discussions.

**Table 3: Proposed RIN volume requirements for 2026–2027 under the Set 2 rule, compared with the volumes established in Set 1 (2023–2025).[26]**

| Billion RINs | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| **Cellulosic biofuel** | 0.84 | 1.09 | 1.38 | 1.30 | 1.36 |
| **Biomass-based diesel (BBD)** | 4.51 | 4.86 | 5.36 | 7.12 | 7.50 |
| **Advanced biofuel** | 5.94 | 6.54 | 7.33 | 9.02 | 9.46 |
| **Conventional (implied mandate)** | 15.00 | 15.00 | 15.00 | 15.00 | 15.00 |
| **Total renewable fuel** | 20.94 | 21.54 | 22.33 | 24.02 | 24.46 |

### 2.4.2.   Decisions on Small Refinery Exemption Petitions (August 2025)

In August 2025, the EPA issued decisions on 175 SRE petitions from the years 2016 through 2024. The EPA fully granted 63 petitions, partially (50%) granted 77 petitions, denied 28 petitions, and found 7 petitions ineligible for consideration. Notable changes from previous

---

[25] US EPA, *Renewable Fuel Standard (RFS) Program - Standards for 2026 and 2027: Draft Regulatory Impact Analysis*, EPA-420-D-25-001 (2025).

[26] OAR US EPA, "Proposed Renewable Fuel Standards for 2026 and 2027," Other Policies and Guidance, June 2, 2025, https://www.epa.gov/renewable-fuel-standard/proposed-renewable-fuel-standards-2026-and-2027.

October 2025                                                                    Charles River Associates

waves of SRE activity include the EPA's recognition of partial DEH and an accompanying partial exemption, and a return to the DOE scoring matrix from the 2011 DOE Study.[27]

Comparing Table 2 (as of August 2025) with Table 4 (as of October 2025), the total number of SRE petitions increased from 453 to 472, indicating that 19 additional petitions were filed in the two months following the EPA's August 2025 decision announcement on 175 pending cases. Over the same period, the number of pending petitions declined sharply—from 195 to just 23—reflecting significant progress in clearing the backlog.

All of the new filings originated from 2021 onward, with four additional petitions submitted for 2021, two for 2022, six for 2023, four for 2024, and three for 2025. For circa 2024 compliance specifically, the total number of petitions rose from 28 to 32. Of these, four were granted full exemptions, eighteen were granted partial exemptions, five were denied, three were deemed ineligible, and two remained pending as of October 2025.

**Table 4: Small Refinery Exemption Petition Decisions as of Oct 2025.[28]**

| Compliance Year | Petitions | Full (100%) Grant | Partial (50%) Grant | Denial | Ineligible | Withdrawn | Pending |
|---|---|---|---|---|---|---|---|
| 2011 | 42 | 24 | 0 | 13 | 3 | 2 | 0 |
| 2012 | 41 | 23 | 0 | 13 | 3 | 2 | 0 |
| 2013 | 30 | 8 | 0 | 18 | 0 | 4 | 0 |
| 2014 | 28 | 8 | 0 | 16 | 0 | 4 | 0 |
| 2015 | 28 | 7 | 0 | 17 | 1 | 3 | 0 |
| 2016 | 29 | 19 | 0 | 8 | 0 | 2 | 0 |
| 2017 | 37 | 35 | 0 | 1 | 0 | 1 | 0 |
| 2018 | 44 | 29 | 3 | 7 | 2 | 3 | 0 |
| 2019 | 34 | 25 | 4 | 1 | 2 | 2 | 0 |
| 2020 | 32 | 7 | 17 | 6 | 2 | 0 | 0 |
| 2021 | 28 | 15 | 6 | 1 | 2 | 0 | 4 |
| 2022 | 26 | 6 | 14 | 3 | 1 | 0 | 2 |
| 2023 | 30 | 6 | 15 | 4 | 1 | 0 | 4 |
| 2024 | 32 | 4 | 18 | 5 | 3 | 0 | 2 |
| 2025 | 11 | 0 | 0 | 0 | 0 | 0 | 11 |
| Total | 472 | 216 | 77 | 113 | 20 | 23 | 23 |

### 2.4.3.  Supplemental Notice on Standards for 2026 and 2027 (September 2025)

In September 2025, the EPA issued a supplemental proposed rule to be considered alongside the Proposed Renewable Fuel Standards for 2026 and 2027. The September rule proposes reallocating exempted RVOs from compliance years 2023-2025 into the 2026 and 2027 percentage standard calculation. The EPA's stated intent is to "account for the anticipated [RIN]

---

[27] EPA, August 2025 Decisions on Petitions for RFS Small Refinery Exemptions.
    https://www.epa.gov/system/files/documents/2025-08/420r25010.pdf

[28] US EPA, "RFS Small Refinery Exemptions."

market impacts of the 2023–2025 exempted RVOs."[29] Suggested reallocation volumes were set at 50% and 100%, with comments accepted on other amounts as well.

# 3.    Key Economic Concepts

## 3.1.    Economic Impacts of the RFS

After many years of analysis and debate, the most significant types of impacts of the RFS are generally understood. Through mandates set by EPA based on societal and environmental goals, the fuels industry is required to increase the volumes of renewable fuels consumed in the United States. These renewable fuels are generally more expensive than conventional fuels and feedstocks, and thus costs of production and final fuel prices are higher than they would be without the RFS. The precise volumes of renewable fuels that would exist without the RFS remains controversial. However, it is likely that corn ethanol would still be blended into gasoline at a high rate up to the "blend wall" of approximately 10% of gasoline demand, while other fuels would reduce in volumes, only anchored by some state programs.

The costs of the RFS are known to impact costs to consumers of transportation fuels and are therefore known to ripple through the economy. In its Draft Regulatory Impact Assessment (RIA) for the June 2025 RFS volume standards proposal, the EPA estimated impacts of the RFS mandated volumes on the costs of various transportation fuels. In its main case, it estimated an impact of about $0.04/gallon of gasoline, and the EPA also provided a scenario where impacts could be nearly $0.11/gallon for diesel. However, this was based on a fairly low assumed D4 and D6 RIN prices of about $0.60/RIN, which the EPA attained by averaging the nominal RIN prices from April 2024 to March 2025, i.e., based off a 12-month average.[30] Current prices are closer to $1.00/RIN and they have been higher within the past 2 years.

## 3.2.    Economic Impacts of SREs

The economic impacts of granted SREs vary across fuel stakeholders. The most direct impact of SREs is on the small refineries that are granted exemptions. Depending on how they are implemented, SREs can drastically lower compliance costs for exempted refiners, thus increasing potential volumes and increasing margins. Larger refineries are indirectly impacted by SREs, with the degree also driven by how the SREs are implemented. In general, large refineries can see their compliance costs either remain or increase, while their competitive positions and sales volumes are diminished when competing with small refineries that receive exemptions.

The degree of impact can vary based on SRE scale, timing, location, and prevailing market conditions. The impacts can also vary based on how the SREs are considered by the EPA when setting RVO standards.

- *Timing* - A key criterion in assessing the impact of SREs is whether the SREs are granted for historical years ("retrospective SREs"), and thus not known at the time of fuel refining, or whether they are known in advance of production decisions. In isolation, retrospective SREs should not impact broader market outcomes because

---

[29] EPA, Renewable Fuel Standard (RFS) Program: Standards for 2026 and 2027, Partial Waiver of 2025 Cellulosic Biofuel Volume Requirement, and Other Changes; Supplemental Notice of Proposed Rulemaking https://www.govinfo.gov/content/pkg/FR-2025-09-18/pdf/2025-18111.pdf

[30] US EPA, *Renewable Fuel Standard (RFS) Program - Standards for 2026 and 2027: Draft Regulatory Impact Analysis.*, p. 441,447, Table: 10.5.1-1

October 2025                                                                    Charles River Associates

small refiners would not consider them in their production decisions and competitive positioning. They would participate in the fuel markets as if the SREs might not be granted. However, when SREs are expected for current production volumes, small refineries can participate in markets with lower marginal costs, thus moving down the supply curve, picking up sales volumes and increasing their margins.

Retrospective SREs are not without impacts. First, the small refineries may experience direct financial benefits from being able to sell RINs or avoid their purchase for previous years' volumes. Second, if the past exempt volumes are reallocated into future RVOs, they can greatly impact compliance costs for large refineries and overall market outcomes.

- *Location* - While transportation fuel pricing is greatly driven by global dynamics due to the key input of crude oil, there are local pricing dynamics that can influence the impacts of SREs. The most significant include the concentration of small versus large refiners and the connectedness of the region to other US regions and to international imports and exports. For markets with a high concentration of small refineries that also happen to be the highest cost producers, there can be impacts on the price of transportation fuel that threaten the profitability of obligated refiners. However, in markets without small refineries, any increased compliance costs for large refiners are more likely to drive up costs to consumers of transportation fuels.

   In regions with significant import and export dynamics, there can be shifts in refinery runs as well as in decisions about where to sell products. Small refiners experiencing increased margins as a result of having exemptions granted, and therefore avoiding RFS compliance costs, are likely to increase production of otherwise obligated fuels, while large refiners would do the opposite. These decisions could cause distortions with unexpected impacts.

- *Market Conditions* - The benefits of SREs to small refineries are greatest when the renewable fuels market is tight, thus creating opportunity for avoided compliance costs and higher margins. The opposite is true for large refineries, with increased costs during periods of higher RIN prices. Also, the impact of higher costs are more acute during periods of tighter refining margins, which can be caused by a variety of factors, including weak demand and periodic oversupply of refined products.

Potentially the most important factor in determining the impact of SREs on market outcomes is whether the EPA reallocates renewable fuel volumes from exempted refiners to obligated refiners. In general, the greater the level of reallocation, the greater the compliance costs for obligated parties, the lower the large refinery margins, the higher the small refinery margins, the higher the transportation fuel price, and the greater the potential dislocations from shifting production and import/export dynamics.

When RIN prices are high, the impact on margins for refiners can be very significant. Importantly, reallocations themselves can drive higher RIN prices due to greater demand for RINs than scenarios without reallocations. The increase can be drastic under certain conditions, such as when the reallocations cause an exhaustion of a lower-cost RIN source and thus create a reliance on a much higher cost RIN source. Pressure on margins for large refiners can have significant consequences for consumers, particularly if any large refineries are driven from the market, via incentive to run at lower rates and/or export volumes.

The potential for reallocations to cause such a jump in RIN prices is significant given current market and policy conditions, including the aggressive growth in the RVO, a dwindling RIN bank, and uncertain feedstock market dynamics. If the EPA decides to apply reallocations of SRE volumes, there is a significant risk of triggering higher RIN prices, with the risk higher for each percentage increase in reallocations.

The greatest uncertainty that could cause RIN price impacts from reallocations is the response of the markets to the increased demand for D4 RINs. The EPA based its RVO expansion on an optimistic view of D4 availability and pricing which is uncertain and is already showing signs of divergence from real-world trends.

The EPA's D4 volume targets rely on assumptions about the growth of renewable diesel and biodiesel feedstocks and production capacity. In its draft Regulatory Impact Analysis (RIA), the EPA projects a supply of 8.6 billion D4 RINs in 2026 and 9.19 billion in 2027, compared to an estimated net supply of 8.18 billion RINs in 2024.[31] EPA supports these projections with an EIA forecast of nearly 6 billion gallons of renewable diesel capacity by 2025. However, recent EIA data shows slower growth, with capacity at 4.7 billion gallons in early 2025.[32] A January 2025 study estimated this could rise to 5.2 billion gallons by the end of 2026, but SAF demand may reduce it to 4.3 billion.[33] The complex relationships between the prices and volumes of RINs, feedstocks, and SAF make forecasting capacity challenging. In addition, renewable diesel capacity could shift backward when economics favor petroleum diesel and capacity itself is not an ideal predictor of production given the need for favorable economics to utilize the capacity.

There is also a disconnect in the EPA assumptions that inform its estimates of the cost of the RFS and the availability and prices of D4 RINs. It assumes a drastic increase in biodiesel and renewable diesel supply (over 1 billion RIN jump), yet also assumes historically low RIN prices (~$0.60/RIN for D4 and D6 RINs) with insufficient justification. The far more common relationship involves higher volume requirements driving higher RIN prices, given a movement up the supply curve. Current RIN prices are closer to $1.00/RIN for D4 and D6 RINs.

## 3.3.   Small Refinery Economics and Competitive Positioning

The granting of SREs is meant to address disproportionate harm to small refineries from compliance with the RFS. This was based on an assumption that small refineries are structurally disadvantaged to large refineries grounded on a variety of factors. It is common to assume that large refineries produce fuels at lower costs due to economies of scale (spreading fixed costs over greater production volumes), including feedstock purchasing power. This would place the small refineries at the upper right portion of a regional supply curve. It was therefore interesting to observe the scattered positioning of large and small refineries across the supply curves in our study, as shown in Figure 8, which isolates the refinery supply curve for Regular BOB in PADD 3 without SREs (supply curves are explored in section 4.2). In this chart, which is based on our analysis of refinery data from Baker & O'Brien, the individual refinery per gallon cost does not include the RVO cost—only the cost to produce regular BOB from feedstock.[34]

---

[31] Renewable Fuel Standard (RFS) Program: Standards for 2026 and 2027: Draft Regulatory Impact Analysis (EPA-420-D-25-001, June 2025)

[32] U.S. biofuels production capacity growth slowed in 2024 - U.S. Energy Information Administration (EIA)

[33] Gerveni, M., T. Hubbs, S. Irwin and S. Ramsey. "Estimates of Sustainable Aviation Fuel Production Capacity at U.S. Renewable Diesel Plants Through 2026." farmdoc daily (15):5, Department of Agricultural and Consumer Economics, University of Illinois at Urbana-Champaign, January 8, 2025.

[34] Baker & O'Brien, Inc. Data from PRISM model.

**Figure 8: Supply Curve of Regular Blendstock for Oxygenate Blending (BOB) for 25Q1, without RVO cost.**

*Source: CRA analysis, Baker&O'Brien refinery data.*

To understand this outcome, we examined the data. First, we confirmed that small refineries generally had higher fixed operating and maintenance (FOM) costs when normalized to total throughput (either by refined output or crude input). However, these costs are a small share of total refining costs, representing only 7% and 5% of total costs for small and large refineries, respectively.[35]

The majority of refining costs are feedstock costs, primarily crude costs, representing approximately 91% of costs for small refineries and 94% of costs for large refineries. We observed that many small refineries had advantages in feedstock costs, effectively offsetting the economies of scale advantage typically enjoyed by larger facilities. Therefore, we explored the underlying economic drivers behind these discounted crude purchases in this section.

### 3.3.1. Evolving Market Dynamics

The feedstock advantage for small refineries stems largely from geographic positioning and the increase in domestic hydrocarbon production brought about by the U.S. shale revolution. Figure 9 below shows the locations of the refineries in PADD 3 relative to crude producing formations and major pipelines. Specifically, we highlight refinery locations (distinguishing between small and large refineries), major onshore Proved Developed Producing (PDP) reserves[36], crude pipelines, and Cushing, Oklahoma.

---

[35] The percentages are based off the average quarterly cost for Q1 2025 for refineries in TX Inland, LA Gulf Coast and N.LA/Arkansas refining districts.

[36] Proved Developed Producing (PDP): Oil and gas reserves that are proven by geological and engineering data, are developed with existing wells and infrastructure, and are currently producing hydrocarbons.

Charles River Associates

**Figure 9: Small Refineries' (from Table 5) location in PADD 3 with respect to major producing Oil and Gas formations in PADD 3**



Several observations can be made regarding refinery distribution within PADD 3:

1. *Geographic Positioning*: Most small refineries are located inland, whereas large refineries are concentrated along the Louisiana and Texas Gulf Coast.

2. *Proximity to Producing Reserves*: The small refineries in PADD 3 are generally situated near onshore PDP reserves. Five of them are located near major shale plays such as the Permian, Eagle Ford, and Haynesville (compare Figure 9 & Figure 10). These are among the facilities observed at the low end of the supply curves in Section 4.

3. *Market Structure:* Many of the small refineries operate as standalone facilities with limited local competition, since most refining capacity is concentrated near the Gulf Coast. In addition, they are situated to serve niche local markets and do not need to distribute refined products far from their locations unless market pricing incentivizes them to do so.

Historically, most large Gulf Coast refineries were constructed or upgraded to process heavy and sour crudes, particularly waterborne imported crudes primarily from Mexico, South America and the Middle East, supplemented more recently with pipeline imports of heavy sour crudes from Canada. Inland PADD 3 refineries generally processed more local crudes, but volumes of these crudes were often not sufficient. In fact, often these smaller inland refineries had to supplement with imported crudes to fill out their capacity, bearing additional costs for transporting the crudes inland.

However, with the U.S. shale boom, driven by advancements in horizontal drilling and hydraulic fracturing, domestic production of light, sweet crude has risen sharply, particularly in the Permian, Eagle Ford, and Haynesville formations (Figure 10).

Impacts of Small Refinery Exemptions

October 2025                                                      Charles River Associates

**Figure 10: Major Tight Oil and Gas (Shale) Plays in the US**



At a high-level, light and sweet crude is easier (cheaper) to refine than heavy and sour crude, which historically caused light grades to trade at a premium. As light crude production from shale formations surged in inland PADD 3 regions during the 2010s, the *form* arbitrage (light vs. heavy) began to diminish, while the *spatial* arbitrage (inland vs. Gulf Coast) widened, together providing relative cost improvements for many smaller, inland refineries.

### 3.3.2.  Light vs. Heavy Crude Pricing (Form Arbitrage)

Due to an increase in domestic light and sweet crude supply, the spread between the prices of light and heavy crudes has been decreasing in the US. The spread between light and heavy is a type of form arbitrage.

The form arbitrage can be observed if we examine the spread between Louisiana Light Sweet (LLS) and imported Mexican Maya as shown in Figure 11.[37] The decreasing spread reflects that the discount for heavy and sour crude (or the premium for light and sweet) has narrowed, eroding the historical competitive advantage of large Gulf Coast refineries over smaller inland refineries. For example, the average real spread between light (LLS) and heavy crude (Maya) has decreased from $20.6/bbl to $8.64/bbl between 2011 to 2024.[38] Given that most small

---

[37] All the pricing trends shown in these figures represent spot price indexes, specifically monthly average cleared last prices. These series capture market-level spot transactions and serve as proxy for comparing form and spatial arbitrage dynamics over time.

[38] Nominal prices adjusted to August 2025 dollars.

refineries are configured to process light, sweet grades, while large refiners refine heavy and sour, the small refiners are relatively advantaged by this diminishing differential.

**Figure 11: Monthly averaged nominal spot price indexes for Louisiana Light Sweet (LLS) and Mexican Maya crude oils, and their corresponding price spread highlighting the form arbitrage.**[39]



### 3.3.3.  Inland vs. Coastal Pricing (Spatial Arbitrage)

The spatial arbitrage between inland and coastal markets, illustrated by the spread between WTI Cushing and WTI Houston (Magellan East Houston, MEH) in Figure 12, has increased (widened) over the same period. While both indexes price similar crude grade (WTI), they represent different delivery locations:

- WTI Cushing reflects inland hub pricing in Oklahoma, and

- WTI Houston (MEH) reflects Gulf Coast pricing tied to export and refinery demand

---

39  EIA, "U.S. Landed Costs of Mexican Mayan Crude Oil (Dollars per Barrel)," accessed October 21, 2025, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=imx2810008&f=m; Bloomberg Terminal, "LLS; WTI Houston; WTI Cushing," n.d.

October 2025                                                    Charles River Associates

Figure 12: Monthly averaged nominal spot price indexes for WTI Cushing and WTI Houston, and their corresponding price spread, which highlights the increasing inland-to-coastal price differential over the past decade.



The widening WTI Cushing–Houston spread highlights the impact of increased inland production, pipeline capacity, transportation costs, and export demand, and suggests that inland refiners, many of which are small, continue to benefit from crude discounts relative to coastal refiners.

Under the assumption of a perfectly competitive market with no information asymmetry, enabling us to treat indexes' prices as market signals, then the above spreads suggest that both the form arbitrage (light vs. heavy crude) and the spatial arbitrage (inland vs. coastal delivery) have shifted in favor of small inland refineries. The historical premium for procuring light and sweet crude for small inland refineries has largely eroded, helping explain why we observed them on the low-cost side of the regular BOB supply curves (Figure 8) directly competing with large refineries.

It is worth highlighting that the DOE matrix from the study in 2011 used by the EPA to assess Disproportionate Economic Hardship (DEH) for small refinery exemptions was developed prior to the shale-driven surge in domestic crude production and the resulting changes to crude market dynamics and relative supply costs.

## 4.    Evaluating SRE and Allocation Impacts

To evaluate the likely impacts of EPA decisions on SREs and reallocations, we conducted analysis on refining cost data, testing assumptions on RFS-related prices and costs. This exercise was meant to illustrate the likely impacts and to evaluate the potential scale of impacts. We used refinery cost and price data from Baker & O'Brien for this exercise.[40]

### 4.1.    Data & Methodology

#### 4.1.1.    Region Selection

Our analysis focused on three refining districts within Petroleum Administration for Defense District 3 (PADD 3): Texas Inland (TX Inland), Louisiana Gulf Coast (LA GC), and North Louisiana–Arkansas (N. LA/AR). These districts were selected due to their representative mix of small and large refineries, allowing for a balanced comparison across refinery sizes.

As of August 2025, a total of nine refineries within PADD 3 had filed for Small Refinery Exemptions (SREs) for the 2024 compliance year, out of a total of 53 refineries in the PADD. All nine of these refineries are located within the three selected refining districts (see Table 5). The remaining two districts—Texas Gulf Coast (TX GC) and New Mexico—were excluded from the analysis, as they contained no refineries that petitioned for SREs during the study period.

The study evaluated refinery cost, price, and production data from the first quarter (Q1) of 2025, as provided by Baker & O'Brien. Q1 2025 was the most recent full quarter of data available at the time of our analysis.

The following table lists the refineries in PADD 3 that filed SRE petitions for 2024, they are also illustrated on a map (Figure 9), the majority of them are observed to be located more inland compared to most large refineries.

**Table 5: Refineries in PADD 3 that filed SRE petitions for 2024.[41]**

| Refinery Name | State | City | Refining District in PADD3 |
|---|---|---|---|
| Hunt Refining | AL | Tuscaloosa | North Louisiana-Arkansas |
| Calumet | LA | Shreveport | North Louisiana-Arkansas |
| Cross Oil | AR | Smackover | North Louisiana-Arkansas |
| Ergon | MS | Vicksburg | North Louisiana-Arkansas |
| Delek | TX | Big Spring | Texas Inland |
| Starlight | TX | San Antonio | Texas Inland |
| Delek | TX | Tyler | Texas Inland |
| Placid | LA | Port Allen | Louisiana Gulf Coast |
| Delek | LA | Krotz Springs | Louisiana Gulf Coast |

#### 4.1.2.    Key Assumptions

Our study of refinery economics includes five key simplifying assumptions.

---

[40] Baker & O'Brien Inc.,

[41] US EPA, "RFS Small Refinery Exemptions."

October 2025                                                               Charles River Associates

1. *Complete pass-through of RIN costs* – Mirroring EPA's policy approach, we assume complete pass-through of all RIN costs to transportation fuel prices. We assume that all refineries required to comply with the RFS share the same cost per RIN. Economic theory also tells us that firms produce as long as marginal revenue is equivalent to or greater than marginal cost. When the RIN cost rises or falls, obligated refineries increase their required price, which can be reflected in the market fuel price.

2. *Inelastic demand* - We assume demand for gasoline and diesel products is perfectly inelastic. In other words, demand is constant in quantity regardless of price. There is significant evidence that gasoline and diesel demand are largely price-inelastic, particularly in the short term.[42]

3. *Constant refinery input and yields* - We assume refinery input and yields do not change in response to RIN policy shifts. If SREs provide a competitive advantage through lower compliance costs, we would expect refineries with crude input just above 75,000 barrels per day to reduce throughput slightly below that threshold. The margin benefit of SRE eligibility would likely outweigh the value of a few thousand additional barrels. Conversely, refineries already below the 75,000-barrel threshold might increase input toward that limit to maximize their profits. Similarly, refiners are not assumed to shift yields toward non-obligated volumes such as jet fuel from obligated volumes such as diesel in response to high RIN prices and vice versa with lower RIN prices.

4. *Common prices* - We assume markets clear instantly at common prices for like fuels. Even with a spot market, the price of refined products is not uniform across consumers. Contracts allow some consumers to hedge by paying above market value or to bet on future delivery prices. As a result, some refineries may receive less than the prevailing market price in practice, trading potential revenue for certainty of sale.

5. *RIN prices* – The exact impact of reallocated SRE volumes on RIN prices is challenging to estimate without detailed biofuel supply chains and refined product prices. We estimated this impact by reviewing recent RIN prices and movements in RIN prices associated with SRE decisions that had uncertain reallocation expectations. We used D6/D4 RIN prices of $0.90/RIN without reallocation and $1.10/RIN with 100% reallocation. Using the 2026–2027 average RVO percentages (with 0% reallocation extrapolated from the 50% and 100% cases), the resulting blended RIN prices used in the study are $0.99/gal without reallocation and $1.18/gal with 100% reallocation. Different RIN prices are explored in a sensitivity analysis.

Using refinery cost data, we simulated two main reallocation scenarios to evaluate the impact of SREs with and without reallocation on cleared market prices and corresponding gross margins for market participants. The results were compared against a baseline case where none of the market participants have an RVO obligation labeled as "*w/o RIN Cost*". The two modeled scenarios are as follows:

1. *Full SRE Granted, 0% Reallocation*: A scenario in which all nine small refineries that filed SRE petitions are fully exempted, and the exempted RVOs are not reallocated to the remaining obligated parties.

2. *Full SRE Granted, 100% Reallocation*: A scenario in which all nine small refineries are again fully exempted, but the entire exempted RVO volume is reallocated. The RVOs

---

[42] EIA, https://www.eia.gov/todayinenergy/detail.php?id=19191#

October 2025                                                    Charles River Associates

for the obligated parties are based on a recalculation of the national RVO based on full SREs and 100% reallocation.

We selected 0% and 100% reallocation cases to represent the two bounding extremes of policy treatment for exempted volumes. Intermediate outcomes (e.g., partial or 50% reallocation) can be approximated through interpolation between these two modeled cases, which provides a more practical and analytically consistent approach than extrapolating.

We first evaluated data for Q1 2025 as it represents the most recent period of available data at the time of this study.

## 4.2.    SRE Decision Impact Analysis (Q1 2025)

### 4.2.1.    Supply Curve Scenario Analysis

For Q1 2025, a total of 23 refineries operated within the three PADD 3 refining districts included in this study. Four refineries were excluded from the analysis because they either did not produce domestic Regular Blendstock for Oxygenated Blending (BOB) during the quarter or contained erroneous data. Of the remaining 19 refineries, seven were classified as small refineries, defined as facilities with an average total feedstock input of less than 80 KBPD.[43] The 19 refineries across the three districts produced 1,504 KBPD for Q1 2025, with a potential exempted volume of 216 KBPD.

The RVO percentages were based on a blend of the actual 2026 and 2027 proposed RVO percentages. For no reallocation, we used 15.05% and for the full reallocation scenario we used 15.74%.

A set of three supply curves are shown in Figure 13. The blue supply curve represents the costs of refineries with no RIN cost for any refinery. The green supply curve represents an RFS scenario with exemptions provided to the small refineries and the volumes not reallocated into the RVO for the remaining obligated parties. The orange supply curve represents a 100% reallocation scenario.  Small refineries are depicted by red markers and large refineries by gray markers.

---

[43] We adopted the 80 KBPD threshold (slightly above the statutory 75 KBPD definition) because several refineries with inputs marginally exceeding 75 KBPD had also submitted for SRE petitions.

Impacts of Small Refinery Exemptions

October 2025                                                                                    Charles River Associates

**Figure 13: 2025 Q1 Regular BOB Supply Curve Reallocation Scenarios.**

Source: CRA analysis, Baker&O'Brien refinery data.

The supply curves above illustrate two key dynamics. First, the marginal refinery setting the market price shifts from a small refinery (red marker) to a large refinery (gray marker) when RFS compliance obligations are imposed solely on large refineries. Second, several small refineries (red markers) appear on the lower-left segment of the supply curve, indicating that many operated with cost structures competitive with those of larger refineries in Q1 2025. This aligns with the underlying economic factors discussed previously.

Table 6 summarizes the marginal prices, average costs, and the average gross margins for small and large refineries under the scenarios depicted in Figure 13.

**Table 6: 2025 Q1 Reg. BOB cost and changes in average gross profit for large and small refineries.**

|  | No RFS | RFS, SREs<br>0% reallocation | RFS, SREs<br>100% reallocation |
|---|---|---|---|
| Marginal price<br>($/gal) | 1.850 | 1.956 | 1.993 |
| Small refinery avg. cost<br>($/gal) | 1.714 | 1.714 | 1.714 |
| Large refinery avg. cost<br>($/gal) | 1.718 | 1.867 | 1.904 |
| Small refinery avg. gross profit<br>($/gal) | 0.136 | 0.242 | 0.279 |
| Large refinery avg. gross profit<br>($/gal) | 0.132 | 0.089 | 0.089 |

Adding RFS obligations to large refineries and granting SREs to small refineries has the combined effect of increasing the average gross profit for small refineries from 13.6¢/gal to a maximum of 27.9¢/gal (more than 100% increase). Reallocations further increase small refinery margins by nearly 4¢/gal. We also evaluated the margin impacts of a move from a scenario with RFS obligations for all refineries (no SREs) to a scenario with RFS obligations for large refineries and SREs for small refineries. The margin increase for small refineries is identical to the increases in the examples above from adding obligations for large refineries. In both cases,

large refineries take over from small refineries in setting the marginal price which includes RIN costs (due to the assumption of full pass-through), while small refineries do not have a RIN cost.

The impact on margins for large refineries moves in the opposite direction. Adding the RFS or granting SREs to an existing RFS both cause average large refinery margins to decline from 13.2¢/gal to 8.9¢/gal. This is driven by the loss of price-setting by the highest cost small refinery.

In this example, under the simplifying assumptions of complete pass-through and RIN prices that do not change, large refineries' gross margins remain unchanged between the two SRE scenarios (0% and 100% reallocation). However, RIN price effects of reallocation decisions could easily cause very different outcomes, as explored in the next section.

### 4.3. RIN Price Sensitivities

As discussed, a key uncertainty when evaluating impacts of SREs and reallocations is the expected RIN price under different scenarios. Small volume obligation changes can have significant impacts on RIN prices, and therefore RIN costs and competitive dynamics between refineries. While this study does not include a detailed build up of a RIN supply curve and testing of RIN price outcomes, we provide this section to show the sensitivity of our results to changes in RIN prices.

To maintain clarity and allow stakeholders to interpret the results intuitively, we limited this sensitivity analysis to a single refining district, TX Inland, and to a single scenario where the EPA grants full SREs and reallocates the volumes 100% into the RVO for obligated parties. The modelled quarter was Q1 2025. The resulting subset includes six refineries, of which three are classified as small refineries, as shown in Figure 14.

**Figure 14: TX Inland Reg. BOB Spot Market Supply Curve with changes in RIN prices for Q1 2025.**

*Source: CRA analysis, Baker&O'Brien refinery data.*

In modeling the three baseline scenarios using Q1 2025 refinery data earlier, we assumed an average weighted RVO price of $1.18 per RIN. As discussed, EPA assumed an average RIN price of about $0.60 per D4/D6 RIN in their Draft RIA study for the Set 2 proposal, resulting in a blended RIN price of $0.75 per RIN.

October 2025                                                                 Charles River Associates

Based on historical data and the volatility caused by an aggressive RVO, it is unlikely the average weighted RIN price will stay constant at $0.75 per RIN, mostly because the D4/D6 RIN price is subject to potential increases and are already hovering around $1.00 per RIN. To analyze the effect of RIN prices on cleared prices and refining margins for small versus large refineries, the average RIN price was varied from $0.50 to $1.50 per RIN, reflecting the historical range of observed D6 RIN prices (see Figure 2). All other parameters were held constant. The results are summarized in Table 7.

**Table 7: Results from the RIN Price Sensitivity Analysis for TX Inland in Q1 2025**

| RIN Price | $0.50/RIN | $1.00/RIN | $1.50/RIN |
|---|---|---|---|
| **Marginal Price ($/gal)** | 1.873 | 1.952 | 2.031 |
| **Small Refinery Avg. Cost ($/gal)** | 1.718 | 1.718 | 1.718 |
| **Large Refinery Avg. Cost ($/gal)** | 1.814 | 1.893 | 1.971 |
| **Small Refinery Avg. Gross Margin ($/gal)** | 0.155 | 0.233 | 0.312 |
| **Large Refinery Avg. Gross Margin ($/gal)** | 0.059 | 0.059 | 0.059 |

As shown, a RIN price move from $0.50 to $1.50 per RIN causes a 16¢/gal increase in the marginal price paid by consumers. Because small refineries are fully exempt under this scenario, their average cost remains constant at $1.72/gal, while large refineries' average cost increases from $1.81/gal to $1.97/gal, an increase of roughly 16¢/gal driven by higher RVO compliance costs.

As RIN prices rise, small refineries' average gross profit margins double, from 15.5¢/gal to 31.2¢/gal, while the average gross margins for large refineries stay constant at 5.9¢/gal due to the simplifying assumption of complete RVO cost pass-through. Incomplete pass-through would decrease the large refinery margin. The contrast between average gross margins with increasing RIN price highlights how increased compliance costs for obligated large refineries enhance the competitive advantage of exempt small refineries.