[ORAL ARGUMENT NOT YET SCHEDULED]

No. 25-1180 (and consolidated cases)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

REH COMPANY, LLC,

*Petitioner,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

*On Petition for Review of Final Agency Action
of the Environmental Protection Agency*

Initial Brief of Amici Curiae NATSO, NACS, and SIGMA
in Support of Granting Petitions for Review by Biofuels Petitioners

Hyland Hunt
Dana Kaersvang
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Ste. 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

*Counsel for* Amici Curiae

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici

Biofuels Petitioners' brief lists all parties, intervenors, and amici except for the following amici in support of Biofuels Petitioners, appearing in this brief: NATSO (formerly the National Association of Truck Stop Operators), NACS (the National Association of Convenience Stores), and SIGMA (formerly the Society of Independent Gasoline Marketers of America).

## B.    Ruling Under Review

Biofuels Petitioners' brief accurately references the rulings at issue.

## C.    Related Cases

All related cases are identified in Biofuels Petitioners' brief.

/s/  Hyland Hunt
Hyland Hunt

i

## RULE 26.1 DISCLOSURE STATEMENTS

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, amici make the following disclosure statements:

**NATSO**, formerly the National Association of Truck Stop Operators, is a non-profit trade association of truck stop and travel center owners and operators which serves as the preeminent voice of the truck stop and travel center industry through advocacy, education, and collaboration. NATSO has no parent company, and no publicly traded company has a 10% or greater ownership interest in NATSO.

**NACS**, the National Association of Convenience Stores, is a non-profit trade association representing the convenience and fuel retailing industry before Congress, the courts, and government agencies. It also produces the industry's most comprehensive data and analysis regarding statistics and trends in convenience and fuel retailing. NACS has no parent company, and no publicly traded company has a 10% or greater ownership interest in NACS.

**SIGMA**, formerly the Society of Independent Gasoline Marketers of America, is a non-profit trade association representing motor fuel retailers and wholesalers, with regular membership limited to companies that are involved in motor fuel retailing or wholesaling. SIGMA has no parent company, and no publicly traded company has a 10% or greater ownership interest in SIGMA.

As trade associations, NATSO, NACS, and SIGMA are exempt from disclosure of members that have issued shares or debt securities to the public under D.C. Circuit Rule 26.1(b).

/s/ Hyland Hunt
Hyland Hunt

iii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................i

RULE 26.1 DISCLOSURE STATEMENTS ........................................... ii

TABLE OF AUTHORITIES ................................................................v

GLOSSARY .................................................................................. vii

INTEREST OF AMICI CURIAE ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................3

ARGUMENT ................................................................................5

I.    Compliance costs for the Renewable Fuel Standard program are passed through to consumers under fundamental economic principles that apply across all fuel markets. ...................................................5

  A. The Renewable Fuel Standard program operates within a competitive national fuel market. ...........................................6

  B. Renewable fuel credits (RINs) are also traded in a competitive national market. ...................................................................10

  C. RIN costs are passed through to wholesalers and consumers nationwide. ...................................................................12

II.   EPA's assumption that no small refinery can pass on any of its RIN costs is arbitrary and capricious. ........................................14

  A. Evidence before EPA showed that small refineries have the same ability as larger refiners to pass on their RIN costs..................15

  B. At a minimum, EPA cannot assume that *no* small refinery can pass on *any* of its RIN costs. .............................................25

CONCLUSION ...........................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iv

## TABLE OF AUTHORITIES

**CASES**

*Alon Refin. Krotz Springs, Inc. v. EPA*,
    172 F.4th 12 (D.C. Cir. 2026) ..................................................................10

*Alon Refin. Krotz Springs, Inc. v. EPA*,
    936 F.3d 628 (D.C. Cir. 2019) ..................................................... 10, 12, 13

*Calumet Shreveport Refin., LLC v. EPA*,
    86 F.4th 1121 (5th Cir. 2023),
    *vacated on other grounds*, 605 U.S. 627 (2025) ...................................23

*Ctr. for Biological Diversity v. EPA*,
    141 F.4th 153 (D.C. Cir. 2025) ......................... 2, 3, 4, 12, 24, 28

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) ..................................................................24

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*,
    594 U.S. 382 (2021) ...............................................................10, 11, 17

*Morall v. DEA*,
    412 F.3d 165 (D.C. Cir. 2005) ..................................................................27

*Sinclair Wyo. Refin. Co. LLC v. EPA*,
    114 F.4th 693 (D.C. Cir. 2024) .......................... 4, 13, 18, 21, 22, 24

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ..................................................................25

**REGULATIONS**

40 C.F.R. § 80.1415(a)-(b) ....................................................................10

**OTHER AUTHORITIES**

Alaska Office of Procurement & Property Mgmt., *Ultra Low Sulfur Diesel* ..........19

Argus Media, *Argus RIN and RVO* ....................................................................20

Diversified Energy Supply, *Choosing a Pricing Method For Your Fuel* ......... 18, 19

EPA, *RIN Trades and Price Information*: *Transaction Volume Report* ...................11

ICE, *Biofuel Outright - D4 RINS (OPIS) Future* ....................................................20

Incubex, *RIN Futures on Nodal Exchange* ..............................................................11

Kristi Moriarty, Nat'l Renewable Energy Lab'y, *High Octane Fuel: Terminal Backgrounder* (2016)...........................................................................................6, 7

Mansfield Energy, *4 Steps to Mastering Pricing Benchmarks* (Apr. 6, 2023) ......8, 9

Mark J. Holmes et al.,
*On the dynamics of gasoline market integration in the United States: Evidence from a pair-wise approach*, 36 Energy Econ. 503 (2013) ......................8

NACS, *Convenience Stores Sell the Most Gas* (Feb. 4, 2025) ..................................7

OPIS Insights, *My OPIS Is Wrong: The Case of the Missing Rack Price Hours* (Jul. 30, 2025) ...........................................................19

OPIS Insights, *Pricing 101: Spot Fuel Markets Made Simple* (Mar. 10, 2023)........9

OPIS, *Energy Prices Overview* ...............................................................................19

OPIS, *OPIS Methodology: OPIS Spot Replacement Index* .......................................8

OPIS, *OPIS Methodology: Wholesale Rack Pricing* ........................................ 19, 21

OPIS, *OPIS to Launch Online Trading Venue for Renewable Identification Number (RIN) Credits* (Aug. 17, 2020) ......................11

OPIS, *Pricing 101: Wholesale Rack Fuel Pricing Essentials* (Mar. 16, 2023).........7

OPIS, *RINs and Carbon Credit Pricing: Carbon Market News Coverage* .............11

OPIS, *Spot Market Pricing* .......................................................................................6

U.S. Dep't of Energy, *How It Works: Refined Petroleum Product Pipelines* ...........8

U.S. Energy Info. Admin., *Number and Capacity of Petroleum Refineries* .............6

U.S. Energy Info. Admin., *Gasoline explained* ......................................................6, 7

U.S. Energy Info. Admin.,
*Gasoline explained: Regional gasoline price differences* ......................................9

## GLOSSARY

| | |
|---|---|
| **EPA** | Environmental Protection Agency |
| **NACS** | National Association of Convenience Stores |
| **NATSO** | formerly, National Association of Truck Stop Operators |
| **RFS** | Renewable Fuel Standard |
| **RIN** | Renewable Identification Number |
| **SIGMA** | formerly, Society of Independent Gasoline Marketers of America |

## INTEREST OF AMICI CURIAE[1]

Amici NATSO (formerly the National Association of Truck Stop Operators), SIGMA: America's Leading Fuel Marketers (formerly the Society of Independent Gasoline Marketers of America), and NACS (the National Association of Convenience Stores) are the leading trade associations representing distributors and retailers of motor fuel. Together, they represent more than 90 percent of retail motor fuel sales in the United States, as well as terminal operators, wholesalers, and distributors.

Amici organizations and their members have significant experience with EPA's Renewable Fuel Standard (RFS) program, as well as direct insight into all segments of the motor fuel value chain. That experience makes them uniquely well-positioned to understand key market fundamentals that underpin the RFS program—and should have underpinned EPA's small refinery exemption analysis.

As EPA and this Court have recognized, one such fundamental is that the costs of compliance—including the costs of renewable fuel credits (called Renewable Identification Numbers or RINs)—are passed on to wholesale purchasers of finished

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amici curiae or their counsel contributed money that was intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E). This brief is accompanied by a motion for leave to file. No party has objected to this brief, but Respondents and some of the Small Refinery Petitioners and Intervenors take no position. See Fed. R. App. P. 29(a)(2)-(4).

motor fuels like amici's members, and ultimately to consumers. That is, "obligated parties recover the cost of acquiring RINs (whether those RINs are purchased from other parties or acquired by blending renewable fuel) through higher sales prices for the gasoline and diesel they produce." JAXX{August.Decisions.10}. The Court recently reiterated that this "central premise"—that "refineries are able to pass RIN costs along to consumers—*is* generally true." *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 188 (D.C. Cir. 2025).

Here, EPA rightly continued to adhere to its "previous findings" that RIN costs are passed through, at "the national level and in competitive markets." JAXX{August.Decisions.12}. But EPA went wrong by then assuming—without evidence—that these findings were completely inapplicable in every petitioning small refinery's markets. EPA admits this assumption will overstate compliance costs. And EPA compounded that error by making its decision based on nonpublic submissions from small refineries without considering contrary record evidence, even while acknowledging that the refineries had not provided the necessary data.

EPA's assumption that market fundamentals don't apply to small refineries is flatly inconsistent with the evidence and amici's real-world market experience. In amici's experience, the transportation fuel markets in which their members participate are "competitive." But even if a hypothetical non-competitive market exists (which EPA did not establish), EPA's assumption that every market where

2

every petitioning small refinery sells fuel is so non-competitive that small refineries cannot pass through any of their RIN costs (*i.e.*, they achieve zero passthrough) is a logical leap from a speculative springboard.

EPA's willingness to assume away fundamental market truths without supporting data is no way to run the RFS program. Amici have a direct interest in a well-functioning, data-driven RFS program—one in which policy outcomes and the investment decisions they inform are consistent with the RIN cost passthrough principle that governs fuels markets. *See Ctr. for Biological Diversity*, 141 F.4th at 188 (holding EPA "reasonably invoked that generally true premise in setting generally applicable … requirements"). However the Court resolves the petitions for review, it should not countenance EPA's use of admittedly evidence-free assumptions to ignore the fundamental economic principles that undergird the fair operation of that program.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As daily participants in wholesale and retail fuel markets, amici's members are deeply familiar with pricing dynamics in those markets, as well as the effects of the RFS program. With respect to what matters here—the cost of RINs (tradable renewable fuel credits)—refineries' ability to pass those costs on to customers does not disappear merely because a refinery sells in a smaller or different local market.

EPA largely agrees that RIN costs are passed through. EPA reaffirmed here that "obligated parties are able to recover their RFS compliance costs" and that parties acquire RINs at the same cost regardless of whether they obtain them by purchase or by blending renewable fuels. JAXX{August.Decisions.12}. Yet EPA refused to apply these principles to small refineries.

Instead, because EPA lacked "granular market-level data" on pricing in "each and every market," it assumed that every market in which every small refinery sells fuel is non-competitive. And not just non-competitive to some degree, but so non-competitive that small refineries' ability to pass through RIN costs is fully erased and they achieve zero passthrough. JAXX{August.Decisions.12}.

That assumption is arbitrary and reprises the error identified by this Court in *Sinclair Wyo. Refin. Co. LLC v. EPA*, 114 F.4th 693, 704 (D.C. Cir. 2024)—only worse (and in the opposite direction). In *Sinclair*, the Court criticized EPA for "applying the theory without showing that every small refiner could immediately pass on RIN costs." *Ctr. for Biological Diversity*, 141 F.4th at 188. But now EPA is applying a no-cost-passthrough theory without any data showing that small refineries are completely unable to pass on RIN costs. Even EPA recognizes that this approach "likely overestimates actual RFS compliance costs." JAXX{August.Decisions.10}. The result is not just insufficiently supported. It is a knowing departure from economic reality.

None of EPA's reasons for ignoring RIN cost passthrough pass muster. EPA had—but disregarded—evidence responding to the concerns identified in *Sinclair*. The evidence before EPA shows that, regardless of size, refineries have access to markets and contracting tools that allow them to mirror RIN and fuel contracts so that their RIN costs are passed on (*i.e.*, where the terms of a RIN contract and a fuel contract are aligned so that price movements in one are reflected in the other). If a small refinery asserts that these fundamental economics do not apply in its markets, and can support that assertion with data, EPA may be able to sustain some degree of exemption. But it cannot adopt an admittedly flawed blanket assumption about all the markets in which all small refineries sell fuel without any data to support it. Much less can EPA leverage this flawed assumption to hypothesize that RIN cost passthrough is completely inoperative, such that no small refinery can pass on even a percentage of its RIN costs.

## ARGUMENT

**I.    Compliance costs for the Renewable Fuel Standard program are passed through to consumers under fundamental economic principles that apply across all fuel markets.**

U.S. fuel markets do not function as isolated "micro-markets" in separate locales. Rather, they are connected by extensive transportation networks, and buyers and sellers in one place inevitably influence prices elsewhere. In fact, businesses regularly compare costs across geographies to make the most efficient purchasing

decisions. The same national market fundamentals therefore underpin fuel prices across the country. As this Court and EPA have recognized, those market fundamentals include the general principle that refineries pass the costs of RFS program compliance through to their customers in the prices of the fuel that they sell. Amici's real-world experience confirms that the general passthrough principle is right—and applies across the connected fuel markets in which amici's members participate.

**A. The Renewable Fuel Standard program operates within a competitive national fuel market.**

**1**. The U.S. motor fuel market is extremely competitive throughout the distribution chain. Generally, the market has three levels, all of which involve numerous competitors and transparent pricing.

At the refining level, crude oil is refined into "blendstocks," which require blending with other liquids to make the finished motor fuel that American motorists buy at filling stations across the country. *See* U.S. Energy Info. Admin., *Gasoline explained*, https://tinyurl.com/4mtxsjd2. There are about 130 refineries in the United States, and they compete with one another, as well as with refineries outside the United States and importers. *See* U.S. Energy Info. Admin., *Number and Capacity of Petroleum Refineries*, https://tinyurl.com/4e336nnf. All these actors deliver blendstocks to fuel terminals around the country, often via pipelines and other low-cost transportation methods. Kristi Moriarty, Nat'l Renewable Energy Lab'y, *High*

*Octane Fuel: Terminal Backgrounder* 1 & fig. 1 (2016), https://tinyurl.com/twc94d77. Real-time price changes are tracked and published for these refined products. OPIS, *Spot Market Pricing*, https://tinyurl.com/59v4djss.

Fuel terminals—more than 1,100 of them at about 400 locations across the United States (often called "racks")—represent the next stage in the distribution chain: the wholesale stage where blendstocks are stored, blended into finished motor fuels, and loaded onto trucks. *See* OPIS, *Pricing 101: Wholesale Rack Fuel Pricing Essentials* (Mar. 16, 2023), https://tinyurl.com/tr5xa4bk; *Gasoline explained*, *supra*. At this stage, ethanol or other renewable fuels are typically blended into finished motor fuels. Moriarty, *supra*, at 1-2; *Gasoline explained*, *supra*. A fuel terminal often has several distinct tanks holding different components of finished fuel—*e.g.*, different gasoline blendstocks, diesel, ethanol, and additives. When a truck arrives at the terminal and selects a particular blend, "products are pulled from various tanks to dispense a finished transportation fuel into the truck." Moriarty, *supra*, at 1.

The truck then delivers that finished fuel to the final retail stage, where it is sold to consumers. At the retail level, there are about 150,000 retail fueling stations in the United States, most operated by amici's members. NACS, *Convenience Stores Sell the Most Gas* (Feb. 4, 2025), https://tinyurl.com/36rc9vw4. At those stations, retail prices are highly transparent and competitive. Price signs are visible from consumers' vehicles, and consumers often can see multiple signs for the same

fungible commodity from a single vantage point. Consumers also can compare prices through mobile applications that list prices from retail fueling stations anywhere in the country.

**2.** Blendstocks, as key inputs for this highly competitive market, can move long distances relatively quickly and cheaply. *See* U.S. Dep't of Energy, *How It Works: Refined Petroleum Product Pipelines*, at 1, https://tinyurl.com/mrh29wxb. This means that prices for the same product tend to converge, differing only by transportation costs. Mark J. Holmes et al., *On the dynamics of gasoline market integration in the United States: Evidence from a pair-wise approach*, 36 Energy Econ. 503, 508 (2013) (finding "strong support" for the "law of one price" in U.S. gasoline markets). Several market tracking services gather price data from the major markets and then factor in transportation costs (truck, rail, or pipeline tariffs; terminal fees; product shrinkage in transit; etc.) to arrive at benchmark prices for hundreds of smaller markets (generally the wholesale "racks" described above). *See, e.g.*, OPIS, *OPIS Methodology: OPIS Spot Replacement Index*, https://tinyurl.com/hrdmr2k6; Mansfield Energy, *4 Steps to Mastering Pricing Benchmarks* (Apr. 6, 2023), https://tinyurl.com/2jn6am7w. Many fuel supply

contracts set prices by indexing the price to the price of fuel in a major market, plus transportation costs to the local market. *See* Mansfield Energy, *supra*.[2]

A consumer taking a road trip from New York to Florida may experience variation in retail gas prices for a variety of reasons: differing state and local taxes, different gasoline formulations and accompanying regulatory requirements, or varying distances from sources of supply. *See* U.S. Energy Info. Admin., *Gasoline explained: Regional gasoline price differences*, https://tinyurl.com/dyy9dn6s.[3]  But these price variations do not mean that market pricing fundamentals for fuel operate differently from market to market. Transportation costs may be lower or higher, depending on where a terminal is located and how blendstocks are transported to it (*e.g.*, by pipeline or not), but in markets across the country—whether large or small—wholesale "rack" prices for a particular product at a particular fuel terminal are set by the same market forces for all market participants.

---

[2] There are seven major markets in the U.S.: New York Harbor, Houston/Gulf Coast, Chicago, Pacific Northwest, San Francisco, Los Angeles, and Group 3 (Midwest). OPIS Insights, *Pricing 101: Spot Fuel Markets Made Simple* (Mar. 10, 2023), https://tinyurl.com/2jvkntvf.

[3] When regulatory requirements mandate uncommon formulations, there may be fewer refineries that make that particular blend, which can affect prices. *See id.* (explaining how prices can be affected by the fact that "relatively few refineries produce California's unique blend of gasoline").

## B. Renewable fuel credits (RINs) are also traded in a competitive national market.

Under the RFS, EPA sets the required volume of renewable fuels annually and apportions responsibility for it among refineries (and importers) in proportion to each obligated party's volume of motor fuel production (or importation). *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 386 (2021).

Refiners demonstrate compliance through credits—called RINs—with each "credit represent[ing] the blending of a certain quantity of renewable fuel" into finished motor fuel. *HollyFrontier*, 594 U.S. at 386. RINs are generated whenever renewable fuels (such as ethanol) are produced or imported, and they are assigned to a batch of renewable fuel. *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 637 (D.C. Cir. 2019).[4] When the renewable fuel is blended into gasoline or diesel—usually at the wholesale stage—the RIN is "separated" from the fuel. *Id.* Once separated, RINs can be bought and sold and are traded on their own, nationwide market.

To satisfy their RFS obligations, refineries must "retire" a certain number of credits annually. *Alon Refin. Krotz Springs, Inc. v. EPA*, 172 F.4th 12, 16 n.1 (D.C. Cir. 2026). A refinery can get the RINs it needs "thanks to its own blending efforts,

---

[4] Each RIN generally represents a gallon of ethanol or its energy equivalent. *See* 40 C.F.R. § 80.1415(a)-(b).

the purchase of credits from someone else, or a combination of both." *HollyFrontier*, 594 U.S. at 386.

Refiners that choose to purchase RINs do so on the RIN market. The RIN market is, if anything, even more integrated and national in scope than fuel markets. Hundreds of millions of RINs are traded each week. EPA, *RIN Trades and Price Information*: *Transaction Volume Report*, https://tinyurl.com/5xzym6bu. [5] RIN prices, like fuel prices, are transparent and tracked by national price-reporting services. *See* OPIS, *RINs and Carbon Credit Pricing: Carbon Market News Coverage*, https://tinyurl.com/muhejs46. There are several online exchanges for RIN trades—both for "physical" RINs and for RIN futures contracts. *See, e.g.*, OPIS, *OPIS to Launch Online Trading Venue for Renewable Identification Number (RIN) Credits* (Aug. 17, 2020), https://tinyurl.com/3jrx9cez; Incubex, *RIN Futures on Nodal Exchange*, https://tinyurl.com/3ubz9d2n. Anyone registered with EPA to own RINs can trade on these exchanges. *See* Growth Energy, Letter to EPA regarding Small Refinery Exemption Petitions by Calumet Montana Refining LLC and others, at 8 (Jan. 2, 2025) (Growth Energy Letter).[6]

---

[5] Although RINs are traded daily, EPA reports weekly numbers.

[6] This letter, which was before EPA when it made the decisions under review, is Exhibit B to Growth Energy and the Renewable Fuels Association's Motion to Correct the Administrative Record, ECF No. #2182834.

### C. RIN costs are passed through to wholesalers and consumers nationwide.

As EPA reaffirmed here, refiners' RIN costs are passed through to wholesale fuel purchasers and ultimately consumers. As EPA explained, "at least … in competitive markets"—which in amici's experience describes the markets in which their members participate, *see infra* Section II.A—study after study has confirmed that "obligated parties are able to recover their compliance costs through the prices they receive for the gasoline and diesel they sell." JAXX{August.Decisions.11}. These studies generally compared fuels subject to RFS obligations to non-obligated analogues (such as fuel designated for export) and found a price "gap rather precisely matching" RIN costs, indicating that refineries were recouping them. *Alon Refin. Krotz Springs*, 936 F.3d at 649. Thus, as this Court has recognized, RIN cost passthrough "*is* generally true." *Ctr. for Biological Diversity*, 141 F.4th at 188 (quoting 88 Fed. Reg. at 44,505).

In addition, as EPA also re-confirmed here, JAXX{August.Decisions.12}, refineries' RIN costs are the same regardless of whether RINs are acquired through purchase or blending. *Alon Refin. Krotz Springs*, 936 F.3d at 650. Studies confirm that "on average, the cost of purchasing separated RINs was equal to the cost of acquiring RINs by blending renewable fuel." JAXX{August.Decisions.11}. And when blenders that are not subject to RFS program obligations (like many of amici's members) separate the RIN from the fuel to sell separately, competitive forces

require that they discount the price of the blended fuel by the price of the RIN. *Id.*; *Alon Refin. Krotz Springs*, 936 F.3d at 650. Effectively, they must sell the renewable fuel for less than they paid for it, with the revenue from RIN sales making up the difference. JAXX{August.Decisions.11}. "In a competitive market there's no such thing as a free lunch, and blenders and integrated refiners pay their [RIN] tab just as others do; they just do so indirectly." *Alon Refin. Krotz Springs*, 936 F.3d at 649-50.

As EPA explained at length in its June 2022 denial of small refinery exemptions, these fundamental principles do not disappear merely because fuel is sold in a local market, even if retail prices sometimes vary. JAXX{June2022.Denials.54} (June 2022 Denial). Although this Court vacated that decision, it did not question EPA's conclusions regarding RIN cost passthrough in general or its basic analysis of how the market operates. *Sinclair*, 114 F.4th at 704. EPA thus properly continued to adhere here to its "previous findings … at the national level and in competitive markets." JAXX{August.Decisions.12}.

EPA's continued affirmation of these general principles makes good sense. The fundamental dynamics of the fuel and RIN markets operate across connected national fuel and RIN markets. As EPA explained in the June 2022 Denial, "no petitioning small refinery has provided EPA with data that contradict" the conclusion that "every fuels market … reflect[s] these same pricing dynamics," and EPA had found no conflicting data elsewhere. JAXX{June2022.Denials.54}. Even now, EPA

13

has not identified any data to suggest that some fuel markets operate outside of the market fundamentals that it agrees apply everywhere else (in "national" and "competitive" fuel markets), and the record now addresses the gaps *Sinclair* identified. JAXX{August.Decisions.12}. That should have been the end of the analysis and resulted in a determination that RIN cost passthrough applies in petitioning small refineries' markets, absent refinery-specific contrary evidence, which the small refineries did not provide.

## II.     EPA's assumption that no small refinery can pass on any of its RIN costs is arbitrary and capricious.

Despite acknowledging that a no-passthrough assumption "likely overestimates actual RFS compliance costs," JAXX{August.Decisions.10}, EPA assumed that every market in which a small refinery sells fuel is a unicorn that does not operate according to the "competitive" market fundamentals that govern every other U.S. fuel market. Worse still, EPA assumed that every small refinery experiences zero passthrough in every market, not simply reduced passthrough in some markets.

This unsupported, blanket carveout of RIN cost passthrough principles is arbitrary and capricious because evidence before the agency—which EPA wholly ignored—established that small refineries have the same ability as larger refineries to pass on RIN costs, using RIN contracts that mirror their fuel sales or other mechanisms. And even if EPA could justify finding that a particular small refinery

14

operated in a particular market where some factor impedes RIN cost passthrough to some degree, it was arbitrary for the agency to assume that *no* small refinery operates in *any* market where it can pass through *any* of its RIN costs. The Court's decision in *Sinclair* neither requires nor endorses such a blanket assumption. Indeed, it forecloses such an evidence-free approach.

### A. Evidence before EPA showed that small refineries have the same ability as larger refiners to pass on their RIN costs.

**1.** For starters, given that EPA agrees that RIN cost passthrough applies in "competitive" markets, it was arbitrary for EPA to assume, without evidence, that it does not apply in any small refinery's market. JAXX{August.Decisions.12}. EPA made no effort to show that small refineries sell only into small markets (or markets that are (purportedly) not "competitive" for some other unexplained reason). There is no inherent correlation between the size of the refiner and the size or functioning of its market. A small refinery can sell fuel into large (presumably competitive) markets—where even EPA would agree RIN costs are reflected in prevailing prices—or it can sell fuel into smaller markets. Larger refiners also sell fuel in all kinds of markets. So EPA's logic fails at step one.

In any event, the theoretical, inefficient micro-markets hypothesized by EPA where RIN costs cannot be fully passed through, *see* JAXX{August.Decisions.12}, have not been shown to exist. In fact, smaller markets tend to have higher wholesale prices, not lower ones. As EPA previously explained, "[i]f a small refinery is facing

competition in its local market from a larger remote market, the local price will typically be higher than the price in the major market, reflecting the cost of shipping the fuel to the local market from the larger remote market." JAXX{June2022.Denials.34} (June 2022 Denial).

This is amici's experience. Amici's members purchase billions of gallons of fuel annually—including from Small Refinery Petitioners. Amici's retailer members purchase and sell fuel in large urban markets, small rural markets, and everything in between. Generally, the price of refined petroleum in a small market equals the price in a nearby large market plus transportation costs. As discussed above, sales contracts often make this connection explicit through indexing. *See supra* Section I.A.2.

Although amici cannot respond directly to Small Refinery Petitioners' nonpublic data, they are unaware of any pockets of the country where market participants have no choice but to sell their fuel at prices *below* the cost of transporting fuel from the nearest major market (where prices are undisputedly set efficiently and include RIN cost passthrough). Nor does EPA identify a market that fits this description. Such a market would be nonsensically inefficient in the context of a highly competitive national fuel market and interlocking transportation system.

Even if some micro-market prices somehow were lower than the efficient level, this would be due to market forces distinct from the RFS program, not from

any inability to pass through RIN costs. Where prices in two markets sustainably differ, it means that non-RIN factors require fuel in one market to be priced lower. It has nothing to do with RIN costs, which are determined in a single national market and are the same regardless of fuel market. *See supra* Section I.B; JAXX{June2022.Denials.38} (June 2022 Denial). Absent a small refinery showing that the price differential between obligated and non-obligated analogues is different in its market than elsewhere—which EPA certainly did not find here—there is no reason to assume that any market's pricing divergence is attributable to differences in RIN cost passthrough. *See* Growth Energy Letter, *supra*, at 13.

That is not to say that small refineries achieve the same margins as large ones, but RIN costs are not the culprit. Small refineries may have higher *non-RIN* costs than their larger competitors, like higher transportation costs, fewer economies of scale, less purchasing power, or more restricted access to crude oil. *See HollyFrontier,* 594 U.S. at 386; JAXX{June2022.Denials.61} (June 2022 Denial). Those higher costs may compress small refineries' margins. But such variations in costs between smaller and larger refineries do not stem from the national economic operation of the RFS program. If a small refinery cannot cover its full cost of production, there is no basis for assuming it is the RIN costs—which are the same everywhere—that it is unable to pass through, rather than its non-RIN costs—which undisputedly differ across different refineries.

**2.** As for passing through RIN costs, the evidence before EPA shows that all refiners, large and small, can use contracting tools to ensure RIN cost passthrough. In *Sinclair*, the Court did not question the basic premise that RIN costs are generally passed through when RINs are purchased ratably (meaning contemporaneously with fuel sales). *See* 114 F.4th at 710-14. Rather, it held that the record in 2022 did not support EPA's assumption that every small refinery could always purchase RINs ratably. *Id.* at 712-14. And it concluded that EPA could not require small refineries to purchase RINs ratably as the means to pass through RIN costs. *Id.* at 709-11. But the evidence here (which EPA ignored) is different. It shows that small refineries have ways to pass through RIN costs whether they choose to purchase ratably or not.

**a.** Whether or not refineries engage in ratable purchasing, all of them—large and small—can manage RIN cost exposure by structuring their fuel and RIN contracts to mirror one another, thereby ensuring that both contracts use prices from the same point in time. Growth Energy Letter, *supra*, at 11.[7]

Blendstocks and finished fuels can be bought and sold through a near-endless variety of contracts. *See* Growth Energy Letter, *supra*, at 8; *see also, e.g.*, Diversified Energy Supply, *Choosing a Pricing Method For Your Fuel*, https://tinyurl.com/2bnjyrxk. Pricing can be fixed or (more commonly) linked to an

---

[7] The cited letter from Growth Energy is a key piece of evidence that EPA ignored. Additional citations reflect publicly available documents about basic market operation.

index or reference price—for which there are many options, including origin-based indices (major markets plus transportation and other costs), destination-based indices (e.g., for particular "racks" or terminals), and a host of timing choices. *See* Diversified Energy Supply, *supra*; OPIS Insights, *My OPIS Is Wrong: The Case of the Missing Rack Price Hours* (Jul. 30, 2025), https://tinyurl.com/3pv4a8n8. For example, one provider offers a particular index with the following timing choices: snapshots of prices as of eight different times a day, a "6 to 6" snapshot, a calendar day benchmark, a Thursday closing price (which reflects Wednesday's price if Thursday is a holiday), and a five-day average. OPIS, *OPIS Methodology: Wholesale Rack Pricing*, https://tinyurl.com/4zh3uwxt (OPIS Methodology).

Use of benchmarks enables fuel contracts to span longer periods of time and respond to market developments in more or less real time (to the degree the parties choose). *See* OPIS, *Energy Prices Overview*, https://tinyurl.com/3rfverpt (describing multiyear contracts). As evidence before EPA detailed, when a benchmark is not available on weekends, contracts typically use a prior-day price. Growth Energy Letter, *supra*, at 11; *see also* OPIS Methodology, *supra* (noting that "the Thursday Close or the 5-Day Average … are commonly referenced in government fuel contracts"); Alaska Office of Procurement & Property Mgmt., *Ultra Low Sulfur Diesel*, https://tinyurl.com/y2afprxw (state fuel purchase contract specifying that

"[f]or deliveries on Saturday-Monday, the price in effect is the OPIS published the previous Friday").

RIN contracts are similarly varied and customizable. Growth Energy Letter, *supra*, at 8. Like fuel contracts, RIN contracts can cover extended periods of time and be priced using fixed prices or a variety of different benchmarks. *Id.* at 9; *see also* Argus Media, *Argus RIN and RVO,* https://tinyurl.com/kb4p7jrs. And—as with fuel—RIN contracts can use different timing mechanisms for index-based pricing. Growth Energy Letter, *supra*, at 9. EPA had before it an exemplar RIN futures contract providing for final settlement "based on the average of the mean of the high and low quotations" in an OPIS product for "each business day … in the determination period." *Id.*; *see also* ICE, *Biofuel Outright - D4 RINS (OPIS) Future*, https://tinyurl.com/muhadcfx.

These common contract features across both fuel and RIN contracts make it possible for refiners of any size to manage RIN cost exposure. Because the same kinds of pricing options are available in fuel and RIN contracts—*e.g.*, using daily, prior-day, monthly average, or other benchmarks—refineries have the option of matching their incremental fuel sales with incremental RIN purchases, and thereby achieving consistent RIN cost passthrough. *See* Growth Energy Letter, *supra*, at 10.

**b.** The evidence regarding how RIN and fuel contracts can be mirrored, which Growth Energy submitted to EPA in these proceedings, addresses several of the concerns identified by the Court in *Sinclair*.

One issue identified in *Sinclair* was weekend purchasing; the Court noted that RIN prices are not available on the weekends, but substantial fuel sales take place then. *Sinclair*, 114 F.4th at 713. The Court hypothesized that a refinery selling fuel on the weekends could not contemporaneously purchase RINs, but would have to either preemptively purchase RINs on Friday or belatedly purchase them on Monday. *Id.*

The evidence now before EPA establishes, however, that there is no need for preemptive or belated RIN purchasing with RIN prices off-cycle from fuel prices. Wholesale fuel benchmarks—the first stage where RIN costs are passed through— are also generally not updated on weekends. *See* Growth Energy Letter, *supra*, at 10; OPIS Methodology, *supra*. Parties handle this in a variety of ways for fuel contracts, such as using prior-day or five-day average pricing. *See* Growth Energy Letter, *supra*, at 11; *supra* pp. 18-19. These pricing mechanisms can be selected for RIN purchases, too. So long as the same pricing mechanism is used in both contracts, RIN cost passthrough is assured.

Relatedly, *Sinclair* faulted EPA for failing to account for smaller refineries' more limited access to working capital, and thus their inability to prepurchase RINs

on Fridays to account for weekend sales. 114 F.4th at 714. But the evidence here shows that no refiner needs to prepurchase RINs, whether to account for weekend sales or otherwise. At "whatever moment an obligated party agrees to sell (or sells) fuel, it can enter into a corresponding RIN contract that mirrors the structure of the fuel sale." Growth Energy Letter, *supra*, at 11.[8]

Another issue identified in *Sinclair* was whether RINs would be available when needed. The Court noted that EPA ruled out requiring RINs to be retired in real-time in favor of an annual compliance demonstration in part because of a "lack of alignment" between RIN generation and fuel demand, which is not consistent throughout the year. 114 F.4th at 712. But RIN retirement and RIN acquisition are two distinct things. As Growth Energy explained to EPA, refiners that do not blend (and therefore cannot separate their own RINs as needed) can signal demand for RINs by purchasing RIN futures contracts, to which RIN producers will respond. Growth Energy Letter, *supra*, at 15. Moreover, as described below, precisely because RIN retirement occurs only once per year, refiners can acquire RINs throughout the

---

[8] The Court also raised concerns in *Sinclair* as to whether RIN costs are "immediately" reflected in fuel prices. 114 F.4th at 714. The Court cited a study indicating that 73% of RIN cost increases were passed through the same day (rather than 100%). As Biofuels Petitioners explain, the study does not indicate non-passthrough, but even if it did, the non-passthrough amount would be tiny. Biofuels Petitioners Opening Br. 48-49, 54-55. It therefore cannot justify assuming 0% passthrough. And, as even EPA agreed here, studies showing "less-than-perfect RIN passthrough" involve small deviations that "would be unlikely to lead to a disproportionate cost of compliance." JAXX{August.Decisions.11}.

year but delay taking delivery of them until they are needed for the compliance demonstration. *Id.* at 11.

Finally, trade minimums are no impediment to small refineries' ability to achieve RIN cost passthrough, either. *See Calumet Shreveport Refin., LLC v. EPA*, 86 F.4th 1121, 1141 (5th Cir. 2023), *vacated on other grounds*, 605 U.S. 627 (2025) (questioning whether a small refinery could engage in a trade for 75,000 RINs). There is no minimum trade volume for physical RIN contracts. Growth Energy Letter, *supra*, at 9. Although there is a small minimum trade volume for RIN futures contracts (50,000), evidence before EPA showed that, in practice, purchasers "have been able to obtain physical and futures RIN contracts for *any* quantity at prevailing flat prices or indexed prices *whenever* they have sought such contracts in the market (while the market is brokered)." *Id*. In addition, small refineries can purchase RIN futures contracts covering periods of a month or longer, thereby increasing the lot size for the contract, while using multiple pricing days to maintain alignment between fuel prices and RIN costs. *Id.* at 13. Again, the key is that all refiners can mirror the terms of fuel and RIN contracts in ways that enable consistent passthrough.

**c.** Beyond mirroring fuel and RIN contracts, evidence submitted to EPA established that small refineries have other mechanisms to ensure they recoup or pass through their RIN costs (just as larger refiners do). As the Court noted in

*Sinclair*, the RFS statute allows refiners to carry forward a RIN deficit in some circumstances, 114 F.4th at 710 (citing 42 U.S.C. § 7545(o)(5)(D)), and wait until the year-end compliance demonstration to retire RINs. *Ctr. for Biological Diversity*, 141 F.4th at 163.

Small refineries have the same option as larger ones to secure the revenue from the RIN premium embedded within their fuel prices but delay paying for RINs until close to the compliance demonstration—and they often do so. *See* Growth Energy Letter, *supra*, at 11. This allows them to invest the RIN premium, rather than tying it up in an inventory of RINs. *Id.* Refiners can invest the RIN premium portion of their fuel sales whether they purchase RINs at the same time they sell fuel (but delay delivery) or not. Either way, returns on capital buffer against any RIN price risk. The choice depends on the refiner's business judgment. It may prove to be a good call or a bad one. *See* JAXX{August.Decisions.11} (noting "parties that choose to delay RIN purchases may pay higher or lower prices for these RINs"). But it is a tool for covering RIN costs available to small refineries on equal terms with larger ones.

**3.** EPA wholly ignored all of this evidence regarding mirrored fuel and RIN contracts, weekend sales, trade volumes, and investment of RIN premiums in assuming that no small refinery could pass through any of its RIN costs. That was arbitrary. *Genuine Parts Co. v. EPA*, 890 F.3d 304, 307 (D.C. Cir. 2018) (holding

24

EPA action was "arbitrary and capricious" when EPA "'entirely failed to consider an important aspect of the problem' by failing to address evidence that runs counter to the agency's decision") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

EPA apparently believed that *Sinclair* required EPA to close its eyes to small refineries' ability to pass through their RIN costs. JAXX{August.Decisions.12}. But *Sinclair* requires no such blinkered analysis. This record is different from the 2022 record and supports different conclusions. *Sinclair*'s drumbeat is that EPA must consider the evidence in lieu of making categorical assumptions. The decisions here utterly failed that test.

### B. At a minimum, EPA cannot assume that *no* small refinery can pass on *any* of its RIN costs.

Even assuming that a particular small refinery could submit data showing that its situation is a counterexample to the rest of the record, and it was unable to pass on some of its RIN costs, EPA's own analysis of generally applicable market principles (endorsed by this Court) indicates that this would be a highly unusual situation. It was therefore arbitrary for EPA to assume that this unique circumstance, if it exists at all, applies in full to every petitioning small refinery.

As the Court echoed in *Sinclair*, agency judgments must be based on "some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). Here, EPA adopted its zero-passthrough assumption

based not on data, but its absence, *i.e.*, because EPA purportedly "lacks the granular market-level data necessary to precisely evaluate" each petitioner's passthrough ability. JAXX{August.Decisions.12}.[9] But small refineries claiming that they are suffering disproportionate economic hardship bear the burden of bringing that data forward. *See* Biofuels Petitioners Opening Br. 46-47.

Small refineries did, in fact, bring forward data that they claim is confidential business information, JAXX n.1{August.Decisions.1}. One might expect that such data would include just the sort of granular information that EPA claims is necessary. *Id.* at 12. But EPA's analysis suggests that small refineries did not bring forward sufficient data for a market analysis—instead asking EPA to assume that fundamental market principles stop at the edge of their markets. And because any data refineries did submit is nonpublic, neither amici nor any other market participant qualified to synthesize and explain such data could evaluate or comment on it, or provide any responsive evidence from their own experience in those same markets. That limitation reinforces why EPA could not treat the (purported) absence of sufficient contrary evidence as support for a zero-passthrough assumption. As it

---

[9] EPA cannot rely on studies by the Department of Energy for evidence, either. As EPA acknowledged, Energy merely "assum[ed] that small refineries that were unable to blend renewable fuel may face a higher cost of compliance," and "[n]either the 2009 [Energy] Study nor the 2011 [Energy] Study considered the possibility that refineries would recover the cost of RINs through higher prices for their products." JAXX & n.59{August.Decisions.11}.

is, and especially coupled with EPA's decision to ignore contrary evidence, the decision is so "stunningly one-sided in its focus" that it is "utterly arbitrary and capricious." *See Morall v. DEA*, 412 F.3d 165, 167 (D.C. Cir. 2005).

The decision is also arbitrary because the zero-passthrough assumption runs counter to logic. As EPA itself acknowledges, RIN cost passthrough is the general rule. JAXX{August.Decisions.12}. And EPA acknowledges that small refineries can likely pass through at least some RIN costs. JAXX{August.Decisions.10}. From these premises, it is an arbitrary leap to conclude that RIN cost passthrough is zero for every small refinery in every market in which a small refinery sells fuel.

Because RIN values are incorporated into transportation fuel prices nationwide, and all obligated parties recover RIN costs in the market through passthrough pricing, any exemption granted to a refinery that already charges a RIN-inclusive market price skews an otherwise well-functioning market, arbitrarily creating winners and losers. That harm is magnified by decisions like this one that take an all-or-nothing approach and assume zero percent RIN cost passthrough for every petitioning small refinery despite acknowledging that this is—at *best*—a gross overestimate of compliance costs.

* * * * *

EPA's decisions here admittedly rest on nothing more than an assumption about RIN cost passthrough—an assumption that EPA agrees is usually untrue. EPA

did not find that any particular market operates without RIN cost passthrough (nor could it on this record). And EPA reaffirmed that RIN cost passthrough generally applies. Yet, EPA decided it does not apply here with no evidence to support it. That sort of evidence- and logic-free decision-making is arbitrary. It is also dangerous, if extended to RFS policy more broadly, where this Court has affirmed that RIN cost passthrough is the proper foundation for general policy. *Ctr. for Biological Diversity*, 141 F.4th at 188. No matter how the Court resolves these petitions, it should not endorse EPA's evidence-free analysis of RIN cost passthrough.

## CONCLUSION

The Court should grant the petitions filed by Biofuels Petitioners.

Respectfully submitted,

/s/ Hyland Hunt
Hyland Hunt
Dana Kaersvang
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Ste. 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

*Counsel for* Amici Curiae

July 17, 2026

28

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief is in 14-point Times New Roman proportional font and contains 6,449 words as counted by Microsoft Word, excluding the items that may be excluded. The brief thus complies with the typeface, style, and volume limitations set forth in Rules 29(a)(5) and 32(a)(5)–(7)(B) of the Federal Rules of Appellate Procedure.


/s/ Hyland Hunt
Hyland Hunt

July 17, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on July 17, 2026, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

/s/ Hyland Hunt
Hyland Hunt
